In re Ali A. SALEH, Fatema
A. Saleh, Debtors.

Ali A. Saleh, et al., Plaintiffs

v.

Bank of America, N.A., Defendant.

Bankruptcy No. 08–36592.
Adversary No. 09–3111.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

April 6, 2010.

Charles J. Roedersheimer, Dayton, OH, for Plaintiffs.

Jason V. Stitt, Keating Muething & Klekamp PLL, Cincinnati, OH, for Defendant.

**DECISION DENYING PLAINTIFF–DEBTORS' REQUEST FOR AN INJUNCTION AND/OR EXTENSION OF THE AUTOMATIC STAY TO PROTECT NON–DEBTOR FOOD CITY, INC. -AND- RENDERING JUDGMENT IN FAVOR OF DEFENDANT BANK OF AMERICA, N.A.**

LAWRENCE S. WALTER, Bankruptcy Judge.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(b)(2) and § 1334 and the standing General Order of Reference in this district. The proceeding arises from the Plaintiff–Debtors' Complaint filed against Bank of America on

April 27, 2009, styled as follows: "Defendant's Complaint for Temporary Restraining Order and Preliminary Injunction to Enjoin Action of Creditor Bank of America Collection Action—Breach of Automatic Stay." As has been clarified in briefing as well as during the trial held on March 3, 2010, what the Plaintiff–Debtors Ali A. Saleh and Fatema A. Saleh (collectively "Debtors") actually seek is a permanent injunction prohibiting Bank of America from pursuing collection of its state court judgment against an Ohio corporation, Food City, Inc. ("Food City"). The basis for the injunction is an alleged "identity of interests" between Food City and Debtor Ali A. Saleh such that collection of the debt against Food City would severely impact the Debtors' Chapter 13 case.

## FINDINGS OF FACT

From the parties' stipulations as well as from the testimony of the witnesses present at the trial held on March 3, 2010, the court makes the following findings of fact relevant to its decision.

Prior to the Chapter 13 bankruptcy filing, Debtor Ali A. Saleh ("Mr. Saleh") was the sole shareholder and officer of Food City, an Ohio subchapter S corporation. Food City operated and continues to operate a small grocery store on Germantown Street in Dayton, Ohio serving the local neighborhood in leased space. It has six employees, including Mr. Saleh, and its operations produce the sole source of income for Mr. Saleh and his family. The Debtors' personal tax records reveal that Mr. Saleh received approximately $82,000 in 2007 and $58,000 in 2008 through a combination of wages and corporate distributions both paid by Food City [Pl. Exs. 7 & 9].

In 2004, Mr. Saleh took out a $72,500 line of credit with Fleet National Bank now owned by Bank of America. Although neither the testimony nor the exhibits clarify which party was intended as the primary borrower, it is clear that both Food City and Mr. Saleh are liable for the debt as either the borrower or the guarantor [see Pl. Exs. 1–8, 1–9 & Def. Ex. H] and the loan was reported as a liability on Food City's tax returns [Pl. Exs. 6 & 8]. Mr. Saleh used most of the funds from the line of credit to open another business that never took flight.

On October 29, 2008, Bank of America filed a civil lawsuit against Food City and Mr. Saleh in an Ohio common pleas court. On December 23, 2008, the Debtors filed their Chapter 13 bankruptcy petition. Food City did not seek bankruptcy protection.

On January 8, 2009, Mr. Saleh filed a "Notice of Bankruptcy and Suggestion of Automatic Stay" in the state court civil action. In the notice, Mr. Saleh asserted that all of Defendant Food City's assets were held and owned solely by Mr. Saleh and, consequently, the automatic stay should not only extend to the actual debtors in bankruptcy but also to Food City.

On February 5, 2009, Bank of America moved for default judgment against Food City for its failure to move, plead or otherwise defend the state court action. Food City filed a response reiterating that Mr. Saleh and Food City were one and the same because all of the assets of Food City were also those of Mr. Saleh.

On April 1, 2009, the court granted Bank of America's motion for default judgment in the civil action. The court held that Food City was a separate and distinct entity from Mr. Saleh. Mr. Saleh had filed a bankruptcy petition while Food City had not. The state court concluded that the evidence before it did not clearly establish that the assets of Food City were owned by Mr. Saleh. For this and other

reasons, default judgment was granted by the state court. A motion to vacate or reconsider the decision was filed, but the state court denied it. Food City did not appeal the state court decision.

Instead, the Debtors proceeded to file a complaint in this adversary proceeding to obtain a permanent injunction against Bank of America based on the alleged identity of interests between Mr. Saleh and Food City.

To support this claimed identity of interests, the Debtors refer to their schedules in which they list business assets allegedly owned by both Mr. Saleh and Food City together. At no point in the Debtors' bankruptcy case, that has proceeded to a confirmed Chapter 13 plan, did Bank of America take issue with the Debtors' characterization of business assets as jointly owned by both Mr. Saleh and Food City.

However, within the schedules themselves, joint ownership rights of assets are not so clearly delineated. In Schedule A, the Debtors list a vacant lot worth $2,000 next to the grocery store. Where the Debtors are to describe the nature of their interest in the property, they instead state "Corporation (Food City) Owns Lot." This is consistent with Montgomery County Ohio real estate records showing that the parking lot is owned by "Food City, Inc." [Def. Ex. A].

In Schedule B, the Debtors list a $10,000 "Liquor License—Food City Inc." and a $15,000 "Security DepositMoney Gram Service—Food City" which also suggests ownership by the corporation itself. Indeed, at the hearing, Mr. Saleh testified that the liquor license was in the corporation's name, although Mr. Saleh signed the application as president or owner. Also in Schedule B, the Debtors list Mr. Saleh's "Equity in Food City Inc" with a value of $31,480. Under that entry is this statement: "Includes Receivables, Store Equip-ment, Goodwill, Depreciation and Accts Receivable...."

The Debtors' proposed plan provides no greater elucidation of ownership rights in these or other specific pieces of property. Nowhere in the plan is there a statement that assets are jointly owned between the Debtors and Food City. Nor does any provision of the plan state an intention by the Debtors to use confirmation of the plan to block Bank of America from pursuing Food City outside of bankruptcy. What the plan does reveal is the Debtors' intention to continue the operation of Food City, including collection of receipts due and payment of business debts and operating expenses, outside the Debtors' personal bankruptcy plan. Further, the plan, as amended prior to confirmation, contemplates that they will use their disposable income to pay unsecured creditors approximately 24% on their claims over the five year life of the plan. Bank of America is listed as an unsecured creditor of the Debtors in their schedules and Bank of America filed a proof of claim in the case. Bank of America did not object to its treatment in the plan and the plan was confirmed on June 20, 2009. The order of confirmation states that property of the estate remains so and does not vest in the Debtors until their case is dismissed or converted or they receive their discharge.

At the trial, other evidence was presented to the court to illuminate the relationship between Mr. Saleh and Food City. The Plaintiffs' first witness was Mr. Ronald Duncan, a Certified Public Accountant for 18 years and a public accountant for 15 years prior to that time. Mr. Duncan testified that he was the accountant for Food City and had prepared financial documents, including tax returns, for both Food City and the Debtors over the last 15 years. He testified that Food City kept separate books, records and accounts from

the Debtors' personal records and accounts. In addition, Food City filed separate corporate tax returns. Food City's tax return for 2007 was admitted as Pl.Ex. 6. The return noted all expenses of the corporation including a $10,000 payment of compensation to Mr. Saleh as officer of the corporation. That $10,000 was reported as income to Mr. Saleh on the Debtors' personal income tax return for 2007 admitted as Pl.Ex. 9. Likewise, the corporation's 2007 operating profit was also reported on the Debtors' personal income tax return for 2007 as income from an S corporation.

Food City's tax return for 2008, admitted as Pl.Ex. 8, similarly included all expenses of the corporation including $500 in compensation to Mr. Saleh as an officer. Net operating profit for Food City in 2008 was listed as $57,000. Again, these same figures were reported as income on the Debtors' personal income tax return for 2008 admitted as Pl.Ex. 7. Mr. Duncan testified that it was normal and routine for a subchapter S corporation's net income, following payment of expenses, to be reported as income from an S corporation on the tax return of the individual.

Also listed on the corporation's tax returns for 2007 and 2008 was the value of the corporation's assets. These assets were valued at $151,395 in 2007 and $103,425, in 2008 [Pl. Exs. 6 & 8]. Mr. Duncan testified that these valuations included only business assets and not the personal assets of Mr. Saleh.

In connection with the preparation of Food City's tax returns for the year 2009, Mr. Duncan also prepared "Food City Inc. Statement of Assets, Liabilities and Equity," as of June 30, 2009 [Pl.Ex. 10]. The document states that as of June 30, 2009, Food City had assets totaling $98,749.22. That number includes the cash, checking account balance, lottery account, inventory, fixed assets, machinery, equipment and furniture and the parking lot adjacent to the grocery store, although the listed value of the parking lot was higher than what Mr. Duncan believed the actual value to be. The number also included deposits, good will and the value of the liquor license. Nowhere on the document is Mr. Saleh listed as owning any of the business assets nor were any of Mr. Saleh's personal assets listed. Mr. Duncan did note that these business assets are critical to the ongoing operation of the grocery store. If the grocery store continues to operate, Mr. Duncan forecasted that Food City could generate a profit in 2009 of $56,000 to $60,000.

Mr. Saleh also testified at the trial and explained his background and relationship to Food City. Mr. Saleh came to the United States in 1973 and has worked in grocery stores since 1974. He opened Food City with a brother and became the sole owner of the store in 1995 or 1996. He noted that all of his accounts with suppliers are opened not only in Food City's name but also in his own as either president or owner of Food City. He testified that while certain assets, like the liquor license, were officially in Food City's name, it was his signature on the application. He also provided examples of invoices and a cigarette dealer's license on which his name is listed along with Food City [Pl. Exs. 2, 4 & 5].

Mr. Saleh confirmed that Food City represents the sole source of income for him and his family and that if assets of Food City would be taken by Bank of America, he cannot pay his employees or afford to fund his and his wife's Chapter 13 plan.

Following the confirmation of the Debtors' plan in this bankruptcy case, Bank of America's state court action against Food City proceeded to a damage hearing held on July 24, 2009. Both Bank of America and Food City were afforded the opportu-

nity to put on evidence of damages. Following the hearing, the state court granted judgment against Food City in the amount of $103,433.30 although Food City is entitled to a credit for any amounts paid to Bank of America by Mr. Saleh through the Debtors' Ch. 13 bankruptcy case. The state court also ordered Bank of America to refrain from pursuing collection, aside from obtaining a certificate of judgment, until this adversary proceeding is resolved.

### LEGAL ANALYSIS

■ The court begins with the basic notions of the automatic stay and the discharge injunction found within the statutory law of the Bankruptcy Code. Generally, neither the protections of the automatic stay during the pendency of the bankruptcy case nor the discharge injunction granted upon the completion of the Debtors' confirmed plan, extend to non-debtor co-defendants. *See* 11 U.S.C. § 362(a) and § 524(e). It is true that § 1301 of the Bankruptcy Code extends a co-debtor stay in very limited circumstances to certain non-debtor "individuals" who share liability with a Chapter 13 debtor on a consumer debt. However, the language of the statute is exceptionally precise and cannot be read to extend the protections of the co-debtor stay to corporations and other non-individuals or non-consumer debts. *See* 11 U.S.C. § 1301(a); *In re McCormick*, 381 B.R. 594, 598 (Bankr.S.D.N.Y. 2008). Consequently, the Chapter 13 Debtors' request for a permanent injunction to essentially extend the protections

of the bankruptcy automatic stay and/or the discharge to Food City, a non-debtor corporation, is viewed by the court with great skepticism.

■ In the Sixth Circuit, the type of injunction requested by the Debtors has been granted in limited circumstances within Chapter 11 cases using a court's inherent powers emanating from Bankruptcy Code Section 105(a) "whose purpose is to assist the court in carrying out the provisions of the Bankruptcy Code, one of which is to oversee the reorganization of a debtor's business." *American Imaging Services v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.)*, 963 F.2d 855, 860 (6th Cir.1992). The Sixth Circuit clarifies that the granting of a § 105(a) injunction is a radical measure to be granted only in "unusual circumstances." *Eagle–Picher*, 963 F.2d at 861. What constitutes "unusual circumstances" is described as an identity of interests between the debtor and the third party such that a judgment against the third party will in effect be a judgment against the debtor. *Id.* (adopting the standard in *A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc)*, 788 F.2d 994, 999 (4th Cir.1986)). An example is given as a case in which a third-party defendant is entitled to absolute indemnity by the debtor on account of any judgment that might result. *Id. See also Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir.2002).[1]

---

1. In *Dow Corning*, the Sixth Circuit provided a more detailed annunciation of the factors that must be present to support including a permanent injunction or release benefiting non-debtor third parties in a Chapter 11 plan of reorganization if the injunction is to be enforced against non-consenting creditors. *Dow Corning*, 280 F.3d at 658. The factors include: (1) an identity of interests between the debtor and the third party, usually an

indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) the im-

■ Although the Sixth Circuit has sanctioned injunctions in these limited circumstances, the court cannot emphasize enough that the imposition of an injunction benefitting a non-debtor third party is an extreme remedy and one that appears to contravene the Bankruptcy Code in the Chapter 13 context. It not only deprives a creditor of the benefits of its bargain, but also "permits the nondebtor party to receive a major benefit of the bankruptcy process without having to be subject to any of its burdens and safeguards." *In re Nat'l Staffing Services, LLC*, 338 B.R. 35, 37 (Bankr.N.D.Ohio 2005). For this reason, bankruptcy cases granting permanent injunctions remain exceedingly rare and are almost always found within the context of a Chapter 11 reorganization.[2]

■ Significantly, the Debtors have not pointed to a single case in which a § 105(a) injunction has been fashioned to protect a corporate non-debtor within a Chapter 13 case. Nor has this court found any case law supporting granting an injunction in such a context. Nonetheless, the Debtors argue that principles adopted by the Sixth Circuit in *Eagle–Picher* and *Dow Corning* are applicable based on the identity of interests between Mr. Saleh and Food City, namely the alleged co-ownership of

property and the fact that Mr. Saleh is a guarantor of Food City's debts. The Debtors argue that the injunction is necessary to prevent Bank of America from pursing collection actions against Food City that could force the grocery store to cease operations and prevent the Debtors from funding their Chapter 13 plan.

Almost identical arguments were examined by the Bankruptcy Court for the Southern District of New York. In the case of *In re McCormick*, 381 B.R. 594 (Bankr. S.D.N.Y.2008), a Chapter 13 debtor requested that the court extend the automatic stay to protect his wholly owned limited liability company through which the debtor operated his general contracting business. The debtor argued that he was employed by the LLC and any adverse action taken against the LLC would effect his employment and, consequently, his ability to fund his Chapter 13 plan and "reorganize." *McCormick*, 381 B.R. at 602. As support for the extension of the stay, the debtor cited to the bankruptcy court's extraordinary powers to issue an injunction under § 105(a) and the standard adopted in the Second Circuit, a standard similar to that adopted in the Fourth Circuit in *A.H. Robins Co. Inc.* and the Sixth Circuit in *Eagle–Picher*. *Id.* at 600–01.

---

pacted class, or classes, has overwhelmingly voted to accept the plan; (5) the plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) the plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) the bankruptcy court made a record of specific factual findings that support its conclusions. *Id.* The applicability of the *Dow Corning* factors to the case at hand is questionable given that the injunction in this case is not sought through the confirmation process during a Chapter 11 reorganization. Nonetheless, the decision highlights the extreme nature of this injunctive remedy and the very limited circumstances in which it is permitted.

**2.** The Debtors cite one case in which an extension of the stay was granted to protect non-debtor individuals within the context of a corporation's Chapter 7 liquidation. *See In re Cheyenne Sales Co., Inc.*, 2009 WL 1405015 (Bankr.N.D.W.Va. May 19, 2009). However, the decision does not provide any justifications for extending this equitable remedy outside the context of a Chapter 11 reorganization. Furthermore, the decision only goes so far as to stay litigation against the non-debtors while the corporation's automatic stay remains in place, a generally short time frame in a Chapter 7 liquidation; the decision does not involve a permanent injunction like the one requested by the Debtors.

While recognizing that there might be some adverse consequences to the debtor should creditors pursue litigation against his wholly owned LLC, the New York bankruptcy court deemed it improper to extend the automatic stay or issue an injunction. *Id.* at 602. First, the court noted that the debtor had failed to provide a satisfactory reason why the LLC could not file its own bankruptcy petition which would invoke the automatic stay on behalf of the company thereby staying all pending collection actions against it. *Id.* Second, the court's own research found no examples in any district in which the automatic stay had been extended to a non-debtor business entity within an individual's Chapter 13 case. *Id.* Finally, the court noted that the limits of the co-debtor stay in a Chapter 13 case are prescribed in § 1301. *Id.* That section does not allow a limited liability company or corporation to receive the protection of the co-debtor stay in a Chapter 13 case. *Id.* For these reasons, the court declined to extend the stay or issue an injunction.

This court adopts the reasoning in *McCormick* which it finds to be applicable to the facts at hand. Like the court in *McCormick,* this court has found no examples of or support for extending the automatic stay or issuing an injunction in a Chapter 13 case to protect a separate commercial entity like an LLC or a corporation. The explicit language of 11 U.S.C. § 1301(a) is undoubtedly the primary reason why. In § 1301, Congress established the scope of a co-debtor stay in Chapter 13 cases which is limited to individuals and consumer debt. If Congress felt it was important to protect corporate co-debtors or business debts, the legislature could have done so within the confines of § 1301. The fact that Congress has declined to so extend the co-debtor stay suggests that corporate co-debtors and business debts are not intended to receive the benefit of the co-debtor stay in a Chapter 13 case. Instead, corporations must file their own bankruptcy case to invoke the protections of the automatic stay. This court has no authority to extend the scope of the Chapter 13 co-debtor stay beyond what is statutorily prescribed.

■ The existence of § 1301 and the limited scope of its co-debtor stay also makes Chapter 11 cases such as *Eagle–Picher, Dow Corning,* and *A.H. Robins* easily distinguishable. There is no statutory section in Chapter 11 comparable to § 1301 which is why bankruptcy courts resort to § 105(a) to extend the stay or issue injunctions within Chapter 11 cases. However, § 105(a) is not a repository of substantive rights and cannot be invoked when the result of its application would be inconsistent with other Bankruptcy Code provisions or substantive rights. *See Greenblatt v. Richard Potasky Jeweler, Inc. (In re Richard Potasky Jeweler, Inc.),* 222 B.R. 816, 825 (S.D.Ohio 1998); *In re Bora Bora, Inc.,* 424 B.R. 17, 2010 WL 282415, at \*4 (Bankr.D.P.R. Jan.20, 2010). In other words, the court cannot use § 105(a) or the rationale of *Eagle–Picher* and *Dow Corning* to fashion an injunction that would conflict with the limited scope of the Chapter 13 co-debtor stay enacted by Congress in 11 U.S.C. § 1301.

■ Even if a § 105(a) injunction were possible, the court finds that the exceedingly difficult standard for issuing such an injunction is not met in this case. The Debtors and Food City do not share such an identity of interests that a permanent injunction is warranted.

First and foremost, all parties agree that Food City is a valid corporation under the laws of Ohio making it a distinct and separate legal entity from Mr. Saleh. Second, the testimony of Food City's accountant, Mr. Duncan, along with supporting

exhibits admitted at the trial, establish that corporate formalities were observed: Food City kept separate records and accounts and filed separate tax returns from Mr. Saleh and his wife.

Nonetheless, to support an intertwining of affairs, the Debtors argued that Food City's net income was also reported as income on the Debtors' personal income tax returns. The court found Mr. Duncan's testimony regarding preparation of the 2007 and 2008 tax returns for Food City and the Debtors particularly illuminating in this regard. Mr. Duncan testified that while Food City's ordinary business income, following payment of business expenses, was reported as income on the Debtors' personal tax returns, this was in no way an unusual circumstance. Instead, Mr. Duncan attested that this was the routine way income was reported for a subchapter S corporation.

The evidence admitted at the hearing also establishes that Food City owns assets separately from the Debtors that have not become property of the Debtors' estate. More specifically, county records demonstrate that Food City is the sole owner of the parking lot adjacent to the grocery store. In addition, Mr. Saleh testified that the liquor license is in the name of the corporation. Also revealing is the document titled "Food City Inc. Statement of Assets, Liabilities & Equity" drafted by Mr. Duncan to aid in the preparation of Food City's 2009 tax returns. This document, admitted as an exhibit during the trial, lists various business assets attributed to Food City including cash, accounts, inventory, land, equipment and the liquor license. Mr. Duncan testified that these were not personal assets of Mr. Saleh, but, instead, business assets of the corporation. Similar valuations were conducted in 2007–2008 to report the total value of corporate assets to the Internal Revenue Service as required on the corporation's tax returns. All of this evidence substantiates separate ownership of readily distinguishable assets by the corporation.[3]

Nonetheless, the Debtors argue that the corporation's assets should be treated as property of the Debtors' estate because the Debtors listed the assets in their schedules and Bank of America did not object to how the Debtors characterized their interests in the assets nor did the creditor object to confirmation of their plan. The Debtors' argument is wholly incorrect. First, regardless of how the Debtors scheduled these assets, the Debtors' actual property interests are determined by reference to nonbankruptcy law; the mere filing of a petition and schedules by the Debtors cannot be used to increase or enhance those interests beyond what existed at the time of the filing. *In re LaVelle*, 350 B.R. 505, 510 (Bankr.D.Idaho 2005). In other words, if Food City, and not the Debtors, owns the property under Ohio law at the time of the bankruptcy filing, then the mere scheduling of assets by the Debtors does not create an ownership interest in them nor do the assets become property of the estate. *Id. See also Old Trail Ltd., Inc. v. Graham (In re Weldon Stump & Co., Inc.)*, 383 B.R. 435, 439 (Bankr.N.D.Ohio 2008) (while federal law controls whether a debtor's interest in

---

**3.** Even if such direct evidence of corporate ownership had not been available, it would have been reasonable for the court and creditors of Food City to believe that the cash, inventory, fixtures, and equipment pertaining to the ordinary course of a grocery business conducted by a corporation engaged in that business were in fact the property of that corporation. To rebut that logical supposition, the Debtors must necessarily provide substantial evidence to the contrary. Here, such evidence is not only lacking but there is significant evidence that Food City owns such property independently from the Debtors.

property becomes property of the estate, the bankruptcy estate's interest is dependent upon the debtor having a prepetition interest in the property under state law).

Second, a review of the schedules reveals that the Debtors' characterization of their property interest in the business assets is vague at best. The manner in which the Debtors list the parking lot, liquor license and money gram service suggests corporate ownership and not ownership by the Debtors themselves. Also in Schedule B, the Debtors listed Mr. Saleh's shares or "equity" in Food City with a value of $31,480. Under that entry is the ambiguous statement: "Includes Receivables, Store Equipment, Goodwill, Depreciation and Accts Receivable...." It is a fundamental principle of corporate law that an individual's ownership of stock in a corporation does not give the individual an ownership interest in the property held by the corporation. *City of Lorain v. Gel–Pak, Inc.*, 20 Ohio App.3d 378, 486 N.E.2d 836, 838 (1984). It is unclear from the Debtors' scheduling of their equity interest in Food City whether they misunderstand this basic principle of corporate law and were attempting to assert direct ownership of these corporate assets or only trying to explain their basis for the valuation of their equity interest as stockholders. These ambiguous entries in their schedules simply do not establish that the Debtors jointly own Food City's corporate assets. *See In re Stacy*, 405 B.R. 872, 879 (Bankr. N.D.Ohio 2009) (because a debtor drafts the schedules and is most familiar with the information contained therein, courts construe ambiguities in the schedules against the debtor); *Foster v. Moore (In re Moore)*, 175 B.R. 13, 15 (Bankr.S.D.Ohio 1994).

The Debtors also cite Mr. Saleh's personal guaranty of Food City debts and the fact that Mr. Saleh personally signed invoices and applications in his own name to support an identity of interests between him and the corporation. However, a "garden-variety" surety relationship in which business people, usually principals, agree to guaranty or be jointly liable on a debt extended to a corporation does not present the type of "unusual circumstances" justifying a § 105(a) injunction. *Nat'l Staffing Services*, 338 B.R. at 38. Furthermore, the few invoices and applications presented by the Debtors bearing both Food City and Mr. Saleh's name were insufficient to show an identity of interests especially given Mr. Saleh's testimony that he often signed them as president or owner of the corporation and not, clearly, in his personal capacity.

For all of these reasons, the court concludes that there is not an identity of interests between Food City and Mr. Saleh that would warrant the extraordinary remedy of issuing an injunction pursuant to § 105(a). The court understands that Bank of America's collection actions could negatively impact the ability of Food City to continue its operations and the Debtors to fund their Chapter 13 plan. However, the Debtors have failed to sufficiently explain why Food City could not file its own bankruptcy petition. As noted in *McCormick*, such a filing would invoke the automatic stay directly on behalf of the company thereby staying all pending collection actions against it. With a bankruptcy filing of its own as a viable method to invoke the automatic stay on behalf of Food City, and the Debtors' own debt to Bank of America subject to discharge, there is no need to turn to the extraordinary and unusual remedy of a § 105(a) injunction to protect this non-debtor entity's operations.

As a final note, the court concludes that Bank of America's actions to date have not violated the automatic stay protecting the Debtors. Since the Debtors' bankruptcy

filing, Bank of America has limited its actions to seeking judgment and pursuing collection activities against Food City, a non-debtor, and such actions do not violate the stay pursuant to 11 U.S.C. § 362.

## *CONCLUSION*

In conclusion, the rationale for issuing an injunction and /or extending the stay to non-debtors within a Chapter 11 case, as described *Eagle–Picher* and *Dow Corning,* is not permitted within the context of a Chapter 13 case. That is because Congress has already established the limits of the Chapter 13 co-debtor stay within § 1301 of the Bankruptcy Code. Section 1301 explicitly limits the scope of the co-debtor stay to individuals and consumer debts. Consequently, Food City is not protected by the co-debtor stay in a Chapter 13 case and § 105(a) cannot be used to expand the co-debtor stay beyond the limits statutorily prescribed.

Furthermore, even if a § 105(a) injunction benefitting non-debtors was permitted within the context of a Chapter 13 case, the Debtors have failed to demonstrate that this case presents unusual circumstances in the form of an identity of interests warranting the rare and extraordinary remedy of this type of injunction. Food City owns business assets separately from the Debtors that did not become property of the estate upon the Debtors' bankruptcy filing. Furthermore, corporate formalities were maintained through Food City keeping separate books, records and accounts and filing separate tax returns from the Debtors. Finally, a personal guaranty of corporate debt is not the type of unusual circumstances that warrants injunctive relief. Consequently, the parties do not share an identity of interests and there is no basis for prohibiting Bank of America from pursuing collection actions against the corporation and corporate assets outside of this bankruptcy court.

For these reasons, the court declines to grant an injunction or an extension of the stay in this case to protect non-debtor Food City, Inc. In addition, the court concludes that Bank of America's continued litigation and collection activities against Food City, Inc. do not violate the automatic stay pursuant to 11 U.S.C. § 362. Judgment is rendered in favor of Defendant Bank of America, N.A. as to all counts and relief requested in the Plaintiff–Debtors' Complaint.

**SO ORDERED.**