IN RE: John Joseph Louis JOHNSON, III, Debtor.

### Case No. 14–57104

United States Bankruptcy Court,
S.D. Ohio, Eastern Division,
**At Columbus.**

Signed April 28, 2016

Daniel A. DeMarco, Rocco I. Debitetto, Cleveland, OH, Marc J. Kessler, Hahn Loeser & Parks LLP, Columbus, OH, for Debtor.

*OPINION AND ORDER GRANTING MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST RFF FAMILY PARTNERSHIP, LP (DOC. 382)*

John E. Hoffman, Jr., United States Bankruptcy Judge

## I. Introduction

In this contested matter, John Joseph Louis "Jack" Johnson, III (the "Debtor") seeks to enforce the automatic stay against RFF Family Partnership, LP ("RFF") and recover damages for its willful violation of the stay. The Debtor is a professional hockey player with the Columbus Blue Jackets of the National Hockey League who filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code more than a year ago. Since then, the Debtor has sought to convert his case to Chapter 7, resulting in a spate of litigation in this Court between the Debtor and a group of his largest creditors, who seek to share in the Debtor's significant future earnings.

One such creditor is RFF. Alleging that the Debtor defrauded it, RFF instituted a prepetition arbitration proceeding against the Debtor and several related parties who had issued it a note allegedly secured by the Debtor's player contract. The Debtor asserted counterclaims against RFF in the arbitration, asserting that it was RFF that defrauded him and his co-borrowers. The Debtor also denied that RFF has a perfected security interest in his player contract. Before the arbitration could proceed further, the Debtor filed his bankruptcy petition. Since then, RFF has continued to demonstrate its desire for one thing: the Debtor's multi-million dollar salary. But the automatic stay, which was triggered upon the Debtor's bankruptcy filing, prevented RFF from asserting any rights in the Debtor's income outside of this Court and from obtaining findings that might impair the Debtor's claims against RFF. This is because the automatic stay prohibits any attempt by a creditor to take an action to exercise control over property of the Debtor's bankruptcy estate, which includes the Debtor's employment contract and his claims against RFF.

But without seeking relief from the automatic stay or even informing the Debtor of its actions, RFF continued the arbitration proceeding under the pretense of asserting claims against parties related to the Debtor. RFF ultimately obtained an arbitration award containing a finding that it has a perfected security interest in the Debtor's player contract and other findings that would defeat the Debtor's claims against RFF. By obtaining these findings and a state court order confirming the arbitration award, RFF attempted to exercise control over the Debtor's bankruptcy estate—both his salary and his counterclaims—to the detriment of the Debtor and his other creditors. And RFF sought these findings intentionally and with full knowledge of the Debtor's bankruptcy, in willful violation of the automatic stay.

The Court accordingly grants the Debtor's motion to enforce the automatic stay and sets a hearing on the issues of (1) the amount of the Debtor's attorneys' fees that RFF must pay and (2) whether punitive

damages should be imposed against RFF and if so, in what amount.[1]

## II. Jurisdiction and Constitutional Authority

The Court has jurisdiction to hear and determine this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O); *Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc. (In re Nat'l Century Fin. Enters., Inc.)*, 423 F.3d 567, 573 (6th Cir.2005) (A "motion to enforce [the automatic stay] constitutes a 'core proceeding'....").

There is disagreement about the circumstances under which an order holding an entity liable for violating the automatic stay while deferring an award of damages under § 362(k) is a final order. In a case where the debtor sought only attorneys' fees and expenses for "contempt" by creditors in violating the automatic stay, the Bankruptcy Appellate Panel for the Sixth Circuit held that a bankruptcy court order granting a motion to enforce the automatic stay, but deferring its decision on the amount of attorneys' fees and expenses that should be awarded under § 362(k), was not a final order. *See In re Webb*, No. BAP 11–8016, 2012 WL 2329051, at *5 (6th Cir. BAP Apr. 9, 2012). Because the Court is deferring an award of attorneys' fees and expenses, this opinion and order would not be considered final under *Webb*. Other courts have held that a bankruptcy court's stay-enforcement order is not final

if it defers consideration of damages other than attorneys' fees, including punitive damages. *See Guy v. Dzikowski (In re Atlas)*, 210 F.3d 1305, 1308 (11th Cir.2000) (holding that an order awarding attorneys' fees and costs under 11 U.S.C. § 362(h) (now § 362(k)) for violation of the automatic stay while "consider[ing] the possibility of future ... damages, but deferr[ing] assessment of those damages" was not a final order); *Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 982 F.2d 769, 776 (2d Cir.1992) (same); *Calcasieu Marine Nat'l Bank v. Morrell (In reMorrell)*, 880 F.2d 855, 856–57 (5th Cir.1989) (same); *see also Eden Place, LLC v. Perl (In re Perl)*, 811 F.3d 1120, 1132 (9th Cir.2016) ("Our sister circuits have uniformly held that an order finding a stay violation but postponing assessment of damages under § 362(k) is not final.") (Watford, J., dissenting). Under these authorities, because this order is deferring not only an award of attorneys' fees and expenses, but also the consideration of punitive damages, this order would not be considered final. *But see Perl*, 811 F.3d at 1126–27 (concluding that an order holding that a party had violated the automatic stay was final and appealable because it was a "substantive ruling with real effects" even though it deferred assessment of all damages), *petition for cert. docketed*, No. 15–1224 (U.S. Mar. 31, 2016).

■ Even if this order were final, the Court has the constitutional authority to enter it after *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475

---

1. Under § 362(k) of the Bankruptcy Code, "an individual injured by any willful violation of [the automatic stay] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k). Although the Debtor has requested no actual damages other than attorneys' fees, the Court has the discretion to impose punitive damages against RFF. *In re Bivens*, 324

B.R. 39, 42 (Bankr.N.D.Ohio 2004) ("For purposes of [§ 362(k)], an award of punitive damages is not conditioned upon the existence of a finding of any actual damages."); *In re Gault*, 136 B.R. 736, 739 (Bankr. E.D.Tenn.1991) (awarding punitive damages for violating the automatic stay even though the only actual damages debtor was entitled to was attorneys' fees).

(2011). The Debtor seeks a judgment finding that RFF violated the automatic stay. After *Stern,* "[t]here is no question that [a] bankruptcy court continues to have the authority to enter judgment on [a] claim for violation of the automatic stay .... [because] the automatic stay is fundamental to the bankruptcy system enacted by Congress." *Loveridge v. Hall (In re Renewable Energy Dev. Corp.),* 500 B.R. 77, 93 (D.Utah 2013), *remanded on other grounds,* 792 F.3d 1274 (10th Cir.2015); *see also Tow v. Henley (In re Henley),* 480 B.R. 708, 765 (Bankr.S.D.Tex.2012) ("[Relief for violation of the automatic stay] is unique to the Code. Such relief is not possible to obtain under state law. As a result, this Court concludes that *Stern* is inapposite, and this Court is constitutionally authorized to enter a final judgment regarding the disputes at bar."). The Court therefore concludes that it has the constitutional authority to enter a final judgment on the Debtor's motion to enforce the automatic stay (the "Enforcement Motion") (Doc. 382).

### III. Procedural History

On October 7, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On May 4, 2015, an arbitrator with ADR Services, Inc. ("ADRS") entered an arbitration award in favor of RFF (the "Arbitration Award"). Ex. 7. Several months later, the Debtor filed the Enforcement Motion, thereby requesting an order enforcing the automatic stay and assessing damages under § 362(k) of the Bankruptcy Code on account of the violation of the automatic stay that the Debtor alleged occurred when RFF obtained the Arbitration Award. In

addition to seeking actual damages in the form of attorneys' fees and expenses, the Debtor requested that the Court impose punitive damages against RFF. Enf't Mot. at 8.

In the Enforcement Motion, the Debtor noted that RFF had filed a petition to confirm the Arbitration Award (the "Petition to Confirm") in an action (the "State Court Action") that RFF had commenced in the Superior Court of California, County of Los Angeles (the "State Court") and that a hearing on the Petition to Confirm was scheduled for October 16, 2015. Enf't Mot. at 3, 5. Despite this, the Debtor did not file a motion requesting that the Court set an expedited hearing on the Enforcement Motion so that it would be held before the hearing in the State Court Action. RFF filed a response to the Enforcement Motion (the "Response") (Doc. 389), and the Debtor filed a reply memorandum (the "Reply") (Doc. 392). Thereafter, RFF and the Debtor submitted a proposed scheduling order fixing, among other things, various deadlines for discovery and a hearing date. The Court entered the order (Doc. 429), setting the hearing on the Enforcement Motion and the Response for December 9, 2015 (the "Hearing").[2] Before the date set for the Hearing, the State Court entered both an order confirming the Arbitration Award and a judgment in favor of RFF. Exs. 12 & 13.

RFF and the Debtor attempted to resolve this matter consensually, but were unsuccessful, and the Court convened the Hearing as scheduled. During the Hearing, the Court heard arguments of counsel and admitted Debtor's Exhibits 1–38 into evidence, including a fee statement by the Debtor's bankruptcy counsel, Hahn Loeser

**2.** A transcript of the Hearing is located at Doc. 479 and will be cited as the Transcript

("Tr.").

& Parks LLP ("HLP"), for the period from June through September 2015 (the "First Fee Statement") (Ex. 32) and a fee statement for the period from October through November 2015 (Ex. 37), without objection. Although RFF filed an exhibit list (Doc. 438) and mentioned the existence of four proposed exhibits at the Hearing, RFF did not seek to admit any evidence at the Hearing.[3] Therefore, each reference the Court makes to an "Exhibit" will refer to the exhibits the Debtor admitted into evidence. To expedite the process for a follow-up hearing on damages in the event the Court found in the Debtor's favor, the Court requested that HLP submit a fee statement reflecting its fees and expenses from December 1, 2015 through the date of the Hearing. HLP filed a supplemental fee statement (Doc. 454), and RFF objected to the requested fees (Doc. 457).

## IV. Background

In a prior opinion in this case, the Court recounted the events leading up to the Debtor's filing of a Chapter 11 petition. *See In re Johnson*, 546 B.R. 83 (Bankr. S.D.Ohio 2016). In short, in 2007, the Debtor began his career as a professional hockey player with the Los Angeles Kings of the National Hockey League. After playing under short-term contracts, the Debtor entered into a contract with the Kings that provided him with compensation of $30.5 million over seven years start-ing in January 2011 (the "Player Contract"). *Id.* at 100. The Kings assigned the Player Contract to the Columbus Blue Jacketsjust over a year later. *Id.* at 100 n.15. By that time, the Debtor—with the involvement of his parents, John Joseph Louis Johnson II and Kristina Johnson[4]—had begun borrowing against the Player Contract, their goal being to " 'have a large sum of money that would be available for investments that would have po-tential earnings sooner rather than later.' " *Id.* at 101 (quoting deposition of Mrs. Johnson).

The Debtor's borrowing continued after his trade to the Blue Jackets. In August 2013, the Debtor and Mrs. Johnson took out a loan from RFF for $175,000, Ex. 18, an amount that increased to $600,000 with-in three months, Ex. 19. Then, in January 2014, the Debtor, the Johnsons and an entity known as Team Johnson Invest-ments, LLC ("TJI") (collectively, the "Bor-rowers"), issued an amended and restated secured promissory note (the "Note") (Ex. 4) to RFF for the sum of $1,862,500, with a maturity date of one month later and an interest rate of three percent per month, compounded monthly.[5] Note at 2; *see also* Ex. 3 (including a copy of the Note signed by the Johnsons). It appears that the Debtor signed the Note on his own behalf and for TJI as its "Manager,"[6]

---

**3.** According to its exhibit list, RFF intended to seek admission of three documents—the En-forcement Motion, the Response, and the Re-ply—that the Court may take judicial notice of. Doc. 438 at 2. The other document de-scribed in RFF's exhibit list was the "[Debt-or's] Responses and Objections to [RFF's] First Set of Interrogatories, Requests for Ad-missions and for Production of Documents Propounded on [the Debtor] with respect to the [Enforcement Motion]." *Id.* RFF did not move for admission of this document nor, for that matter, did RFF even mention this docu-ment or present it to the Court.

**4.** The Court will refer to the Debtor's parents individually as Mr. Johnson and Mrs. Johnson and collectively as the Johnsons.

**5.** As the Debtor points out, a 3% monthly interest rate compounded monthly converts to nearly 42.58% per annum. Ex. 5 at 6.

**6.** The Court has been provided with little oth-er information about TJI, except that it was organized by Mrs. Johnson. *See* Ex. 20 (Arti-cles of Organization for TJI, showing Mrs. Johnson as the registered agent and organiz-er). Although the Debtor appears to have acted on behalf of TJI, he has also stated that

Note at 8, and that the Johnsons signed the Note in their individual capacities. Ex. 3.

The Note stated that the Borrowers were granting REF a first lien on certain property, including two Ferraris, one owned by the Debtor and another owned by his father. The most valuable collateral, however, was the Debtor's $30 million Player Contract. Note at 4. With respect to the Player Contract, the Note provided that the

> [Debtor] will execute an Authorization Agreement for Direct Deposit and deliver the same to the Columbus Blue Jackets ... directing that [his] salary payments owing ... under the ... Player Contract ... be paid to [RFF] until the obligation herein ... and all accrued interest and expenses under this Note is paid in full. [The Debtor] warrants and represents that he will not revoke, terminate, or otherwise modify this direct deposit authorization until this Note is paid in full.

*Id.* at 3–4.

Consistent with the terms of the Note, in January 2014, the Debtor signed a letter agreement stating that he "directs that all payments due and owing by [the Columbus Blue Jackets] to [the Debtor] be sent via wire transfer ... to [an account in the name of RFF]" (the "Letter Agreement") and an "Assignment of Contracts" assigning his rights to payments under the Player Contract to RFF (the "Assignment"). Ex. 3. In late January 2014, RFF filed several U.C.C. financing statements (the "Financing Statements") identifying its collateral as including amounts to be paid under the Player Contract. Ex. 3. Like the Note, a Security and Pledge Agreement (the "Security Agreement") purport-

ed to grant RFF a security interest in substantially all of the Debtor's assets, including the Player Contract. Exs. 22 & 23. By May 2014, the Borrowers had allegedly made only a single payment of $25,000 on the Note. Ex. 25 at 2.

Any disputes arising out of the Note, the Assignment and the Security Agreement were to be submitted to binding arbitration before ADRS. Ex. 3. Thus, approximately one month before the Petition Date, RFF commenced an arbitration action (the "Arbitration Action") by filing a "Demand for Arbitration" with ADRS, naming the Johnsons, TJI and the Debtor as the "Respondents" and seeking over $1.6 million for payment on the Note. *Id.* RFF identified the nature of the dispute that it was submitting to arbitration and the relief that it was seeking in an attachment to its Demand for Arbitration. The portion of the attachment that described the nature of the dispute was made up of two parts: (1) a "Claim for Money Due on Default on Promissory Note and Breach of Contract" and (2) a "Claim for Fraud." Ex. 3.

In the section of the attachment describing the claim for money due on the Note, RFF alleged, among other things that:

> 1. Claimant [RFF] is, and at all times relevant to this action was, a California limited partnership organized and existing under the laws of the State of California and a finance lender licensed by the California Department of Corporations exempt from usury laws in accordance with *California Constitution, Article XV, Section 1 and California Finance Code, Section 22000 et seq.*
>
> . . . .

---

he had not heard of TJI prior to his bankruptcy, Doc. 402 at 52, and that he "does not

assert an interest in TJI," Reply at 4 n.3.

7. The [Note] is secured by the [Security Agreement] executed by Respondents before a notary public and perfected by [the Financing Statements], [the Assignment] executed by Respondents before a notary public, and the [Letter Agreement] executed by Respondents before a notary public.[ 7]

. . . .

9.F. [RFF] is informed and believes and based upon such information and belief alleges that Respondents did not deliver [the Letter Agreement] to the Colombus [sic][ 8] Blue Jackets directing [the team] to pay all money owed to [the Debtor] under his National Hockey League Player Contract to [RFF] until the principal debt and all accrued interest and expenses under the [Note] was paid in full. . . . In breach of their promises and representations, Respondents have been receiving and will continue to receive the entire $5,000,000 owed this year under [the Player Contract] and no payments have been made to [RFF].

Ex. 3. In the section of the attachment describing the claim for fraud, RFF alleged, among other things, that:

13. On or about January 21, 2014, Respondents promised, warranted, and represented that if [RFF] loaned them money, Respondents would pay the full amount by February 21, 2014 and execute [the Letter Agreement] and deliver the same to the Columbus Blue Jackets directing [the team] to pay [RFF] all money owed to [the Debtor] under his [Player Contract] until the principal debt and all accrued interest and expenses under the [Note] was paid in full,

not revoke, terminate, or otherwise modify the [Letter Agreement] until the [Note] was paid in full, and execute and deliver to [RFF] . . . all [documents that RFF] shall require in order to perfect and maintain [RFF's] rights and security interested [sic] under the [Note].

14. [A]t the time Respondents made these promises and representations, [they] had no intention of performing them and made these premises [sic] and representations with the intent to defraud [RFF] and induce [RFF] to loan them money.

15. [T]hese promises and representations were false, and when Respondents made these promises and representations Respondents knew they were false or had no reasonable ground for believing they were true. Respondents made these representations with the intent to defraud and induce [RFF] to loan them money. Contrary to such promises and representations, Respondents did not deliver [the Letter Agreement] to the Columbus Blue Jackets. . . . In breach of their promises, warranty and representations, Respondents have been receiving and will continue to receive the entire $5,000,000 owed this year under [the Player Contract] and no payments have been made to [RFF].

16. In reasonable reliance on Respondents' promises and representations, [RFF] loaned Respondents money. At the time [RFF] loaned Respondents money, [RFF] did not know Respondents [sic] promises and representation[s] were false and believed they were

---

7. The Debtor is the only one of the Borrowers that signed the Letter Agreement and the Assignment. The Debtor signed the Letter Agreement in his personal capacity only. He signed the Assignment on his own and on behalf of TJI—perhaps because it purported to assign not only the Player Contract, but

also the Debtor's and/or TJI's interest in a joint venture agreement.

8. Unlike the Arbitration Award that RFF submitted to the arbitrator, the Demand for Arbitration is replete with typographical errors.

true. [RFF] acted in justifiable reliance upon the truth of these representations. If [RFF] had known Respondents' promises and representations were false and what Respondents' actual intentions were, [RFF] would not have loaned money to Respondents.

. . . .

18. In doing the forgoing acts, Respondents acted maliciously, fraudulently, oppressively, willfully, and in conscious disregard if [sic] the rights of [RFF], and are guilty of malice, fraud, and oppression as defined by *Civil Code, Section 3294,* and [RFF] is entitled to recover, in addition to actual damaged [sic], exemplary and punitive damages against Respondents.

Ex. 3.

Before the Petition Date, the Debtor filed a response to the Demand for Arbitration. Ex. 5. In his response, the Debtor denied RFF's allegation that the Note is secured by the Assignment, the Letter Agreement, and the Security Agreement and also denied RFF's allegation that its security interest was perfected by the filing of the Financing Statements. The Debtor likewise denied RFF's allegations that it had been defrauded. *Id.* at 2. Contrary to RFF's allegations that it was exempt from California's usury laws, the Debtor alleged that RFF had violated California's usury laws by charging an interest rate of 42.576% per annum. *Id.* at 8. In several other counterclaims, the Debtor alleged that the Note was the result of RFF's fraudulent actions—that RFF is a predatory lender that "duped" the Debtor into signing the Note, "[took] advantage and prey[ed] on an unsophisticated investor and his even-less-sophisticated mother" and fraudulently induced the Borrowers by "falsely claiming that the interest rate was a mere 3%." *Id.* at 6, 8–11. The Debtor

sought compensatory and punitive damages on his counterclaims. *Id.* at 11.

The parties had not selected an arbitrator by the time the Debtor filed his bankruptcy petition. A few days after the Petition Date, counsel for the Debtor, Marc Kessler ("Kessler") of HLP, sent Dayton Parcells ("Parcells")—an attorney who was representing RFF in connection with the arbitration—a letter (the "October 2014 Letter") informing him of the Debtor's bankruptcy filing and advising him that:

> Section 362 of the Bankruptcy Code prohibits the commencement or continuation, including the issuance or employment of process, of a judicial, administrative or other proceeding against [the Debtor] that was or could have been commenced prior to the filing of the bankruptcy petition. *See* 11 U.S.C. § 362(a)(1). Accordingly, the [Arbitration Action] is stayed as to [the Debtor] pursuant, *inter alia,* to Bankruptcy Code 362(a).

Ex. 2. Kessler sent a copy of the letter to Theresa Aslin ("Aslin"), the case manager ADRS had assigned to the arbitration.

RFF thereafter fully participated in the Debtor's bankruptcy case. Jeffrey Levinson ("Levinson") filed a notice of appearance as counsel for the Debtor. Doc. 27. Through Levinson, RFF continued to assert that the Note is secured by the amounts the Debtor is entitled to receive under the Player Contract, and it appeared at the time that the bankruptcy forum was the only one in which RFF was doing so. On December 1, 2014, RFF filed a proof of claim asserting a secured claim in the amount of $1,700,402.19 (Claim No. 5), contending that its lien was perfected by the Financing Statements and the Assignment. Then, when the Debtor filed a motion for an order authorizing the maintenance of his existing bank accounts and a motion for an order establishing proce-

dures for monthly compensation of professionals, RFF objected, arguing that the Note was secured by the Player Contract, the Assignment and the Letter Agreement. Docs. 16, 20 & 34. RFF also contended that it had perfected its security interest by filing the Financing Statements, meaning that the Debtor's salary was RFF's cash collateral that had to be segregated for the benefit of RFF. *See* Doc. 34 at 3–4.

The Debtor replied to RFF's objection and argued that "RFF does not have, and never has held, a valid security interest in, or assignment of, Debtor's wages because RFF can neither hold nor perfect a valid security interest" and that "any purported interest in or assignment of post-petition wages was cut off by § 552(a)." Doc. 48 at 8–9. During the hearing on the Debtor's motions held on December 2, 2014, counsel for RFF argued in support of RFF's secured position:

> We believe that the security interest that we held prepetition continues post petition here, because there's value in [the Player Contract] that exists without respect to the services that are performed. [The Debtor], simply by virtue of being employed, as he was on the [P]etition [D]ate and prepetition and post petition, has rights under that contract that he gave—granted to my client as collateral for the claim that we have. So that value, whether it's the guaranteed amount or, you know, if he's injured he earns an amount, to view this as a wage, a pure consumer type wage situation, we think is inappropriate. This is clearly of a different nature. This is a contract that's already been assigned. The assignment of the contract was done as collateral for our claim, so we believe that we do have that claim.

Doc. 398 (transcript of Dec. 2, 2014 status conference) at 35.

RFF's objections to the motions were resolved by agreed orders with the Debtor that were "without prejudice to the respective rights of RFF, and other creditor or party in interest and the Debtor with respect to the Debtor's use of cash collateral." Doc. 77 at 5; Doc. 78 at 5. Thus, the issues of whether the Note is secured by the Player Contract, the Assignment and the Letter Agreement, and whether RFF perfected its security interest by filing the Financing Statements, remained live issues in this Court. *See, e.g.*, Doc. 184 (RFF's objection to the Conversion Motion, in which RFF stated that the Debtor's and TJI's obligations under the Note are secured by the Debtor's rights in the Player Contract—through the Security Agreement, the Assignment and the Letter Agreement—and that RFF's security interest was perfected by the filing of the Financing Statements).

In April 2015, RFF filed an adversary proceeding (the "Adversary Proceeding") (Adv. No. 15–2117) asserting that its claim is nondischargeable and seeking a denial of the Debtor's discharge. Ex. 24. The Debtor filed both an answer and counterclaims. Exs. 25 & 26. Like the Debtor's counterclaims in the Arbitration Action, his counterclaims in the Adversary Proceeding allege that the Note is usurious and that RFF engaged in fraudulent conduct. In particular, the Debtor again alleged that RFF "duped" the Debtor and that RFF had misled him and Mrs. Johnson about the interest rate on the Note. Ex. 26 at 2–3.

In its objections to the Debtor's motions for approval of interim compensation procedures and an order authorizing the maintenance of his existing bank accounts, RFF had stated that it might at some point "seek relief from stay under [11

.U.S.C. § 362] to continue the Arbitration [Action] as agreed in order to adjudicate the claims asserted therein[.]" Doc. 34 at 5 n.1. But it never did.[9] Instead, unbeknownst to the Debtor at the time he filed his counterclaims in the Adversary Proceeding, this Court was not the only arena in which RFF was attempting to establish that it holds a perfected security interest in the proceeds of the Player Contract. In fact, at the same time it was arguing in support of its perfected secured position in the Debtor's bankruptcy case, RFF was taking steps outside of this Court to obtain findings concerning the Player Contract, including a finding that the Player Contract secured RFF's claim against the Debtor and a finding that RFF's purported security interest in the Player Contract was perfected by the filing of the Financing Statements. In addition, RFF was seeking an extra-bankruptcy adjudication of the issues of whether it was subject to California's usury laws and whether it had engaged in fraud or instead had been defrauded—issues on which the Debtor would have to prevail in order to succeed on his usury and fraud-based claims against RFF.

RFF began down this path when, on December 1, 2014 (the same day it filed its proof of claim and the day before the hearing at which RFF argued that it had a lien on the proceeds of the Player Contract), Parcells sent an e-mail to ADRS's Aslin. In that e-mail, Parcells correctly informed Aslin that only the Debtor, not the Johnsons or TJI, had filed a bankruptcy case. But Parcells also advised Aslin that "[t]he resulting bankruptcy stay *only* applies to [the Debtor]." Ex. 6 (emphasis added). This statement was incorrect. For while the automatic stay applies to the Debtor personally, it also prohibits "any act to . . . exercise control over property of the [Debtor's bankruptcy] estate," 11 U.S.C. § 362(a)(3), including the Player Contract and the Debtor's claims against RFF.[10]

In his December 1, 2014 e-mail, Parcells notified Aslin that RFF "would like to proceed with the arbitration against [the Johnsons and TJI]" and also requested that ADRS "commence the Arbitrator Selection Process." Ex. 6. Because Kessler had copied Aslin on the notice of bankruptcy stay that he sent Parcells, it was reasonable for Kessler to expect Parcells to copy him on his e-mail to Aslin. Parcells, however, did not do so; he copied the Johnsons, but did not provide Kessler or any other attorney for the Debtor with a copy of his e-mail. In fact, RFF failed to . provide the Debtor with any notice whatsoever that it was continuing the Arbitration Action.

Without the Debtor's input, an arbitrator was selected, and the Arbitration Action moved forward. On April 22, 2015, RFF filed an arbitration brief (the "Arbitration Brief") (Ex. 35), serving it on the Johnsons and TJI care of Mrs. Johnson.[11]

9. RFF was no stranger to the concept of the need for relief from the automatic stay before seeking to exercise control over property of the Debtor's estate. Indeed, it filed multiple motions for relief from the automatic stay with respect to certain of the Debtor's motor vehicles. Docs. 111 & 123. The Court, however, denied them as noncompliant with its local rules. Docs. 122 & 140.

10. To the extent statements made in this section of the opinion constitute conclusions of law, they are adopted as such. Likewise, to the extent any of the statements made in the legal analysis section of this opinion constitute findings of fact, they are adopted as such.

11. After the demand for arbitration was served on all the Borrowers through Kessler, whenever a document was served on TJI in the Arbitration Action, such service was made on Mrs. Johnson as TJI's "Agent for Service of Process." Ex. 8 at 34; Ex. 12 at 3; Ex. 13 at 2; Ex. 29 at 3; Ex. 30 at 3; Ex. 35 at 8.

RFF obviously paid attention to details when it prepared the Arbitration Brief. For example, unlike the Demand for Arbitration, it contains few typographical errors. In addition, despite providing no notice to the Debtor, RFF took the position in the Arbitration Brief that the Note is secured by the Assignment of the Player Contract and the Letter Agreement and that its lien was perfected by the filing of the Financing Statements. Ex. 35 at 3. On May 4, 2015, the arbitrator entered the Arbitration Award. Although there are minor differences between the Arbitration Award and the Arbitration Brief, the Arbitration Award largely tracks the Arbitration Brief verbatim. Both documents state that the arbitration was brought against TJI and the Johnsons, defining them as the "Respondents." Yet the Arbitration Award, again like the Arbitration Brief, sometimes uses the term "Respondents" when the party to which it is referring could only be the Debtor. For example, the Arbitration Award finds that the "Respondents" made certain representations and warranties in the Letter Agreement. Ex. 7 at 5. But the Debtor was the only Borrower to sign, or that the parties contemplated would sign, the Letter Agreement assigning his wages. Note at 3–4 ("To secure the payment of this Note ... Borrower will execute an [agreement] ... directing that [his] salary payments ... and [his] entire compensation be paid to [RFF] until the obligation herein ... is paid in full."); Ex. 3. Both the Arbitration Award and Arbitration Brief also identify the Debtor as a "Respondent," by stating that "Respondent JOHN JOSEPH-LOUIS JOHNSON III ("Jack Johnson") is not included in this Arbitration because the claim against him has been stayed[.]" Ex. 7 at 1; Ex. 35 at 1.

Furthermore, despite stating that the Debtor is not included in the arbitration, the Arbitration Award—again tracking the Arbitration Brief word for word—goes on to make specific findings with respect to the Player Contract, as well as findings that are inconsistent with the Debtor's claims against RFF. In particular, the Arbitration Award includes two findings taken directly from the Arbitration Brief to the effect that the Player Contract secures the Note. First, the Arbitration Award states that the Note "is secured by ... a January 2, 2014 Assignment of Contracts executed by Jack Johnson before a notary public." Ex. 7 at 3. Second, the Arbitration Award provides that the Note "is secured by ... a January 21, 2014 letter agreement executed by Jack Johnson before a notary public." *Id.* That is, rather than limiting its reference to the Debtor to the statement that he was not included in the Arbitration Action, RFF also included specific references to the Debtor in the Arbitration Brief relating to the Player Contract, references that became findings in the Arbitration Award. To be clear, RFF filed the Arbitration Brief after the Debtor was no longer receiving notices in the arbitration and after the Debtor ostensibly was no longer included in the arbitration. Despite this, RFF made allegations in the Arbitration Brief relating to the Player Contract and caused those allegations to become findings in the Arbitration Award that the Note is secured by the Assignment and the Letter Agreement.

The Arbitration Award should not have included findings to the effect that the Note was secured by the Player Contract. But given that it did, and given the fact that the Financing Statements cover the Player Contract, RFF certainly should have ensured that the Arbitration Award made clear that any finding regarding the perfection of RFF's security interest did not extend to RFF's purported security interest in the Player Contract. The Arbitration Award, however, did not include an

unambiguous statement in that regard. True, it stated that the Note "is secured by ... [the Security Agreement] *executed by Respondents* before a notary public ... and perfected by [the Financing Statements]." *Id.* (emphasis added). But it is not clear that the phrase "executed by Respondents" does anything more than identify the Security Agreement. The Debtor also signed the Security Agreement, so noting that the Security Agreement was "executed by Respondents" did not clearly limit the statement regarding perfection to RFF's security interest in the collateral of TJI and the Johnsons. The Court would find this to be the case even if the Arbitration Award had used the term "Respondents" consistently to refer only to the Johnsons and TJI. It is even more true here given that the Arbitration Award uses the term "Respondents" when the party it is referencing could only be the Debtor and given that the Arbitration Award, because he had once been a Respondent, also refers to the Debtor as a "Respondent."

During the hearing on the Enforcement Motion, Levinson argued that the findings that the Note is secured by the Assignment and the Letter Agreement are unproblematic because they were findings of fact, not holdings. Tr. at 44–45. Yet under the California law that governs the Note and related documents, "[i]t is a recognized principle that an arbitration award is conclusive on *matters of fact* and law." *Trollope v. Jeffries*, 55 Cal.App.3d 816, 128 Cal.Rptr. 115, 120 (1976) (emphasis added). In short, by submitting its Arbitration Brief and causing statements in that brief to be incorporated as findings in the Arbitration Award, RFF received at least part of what it was seeking in the Debtor's bankruptcy case—findings to the effect that it had a security interest in the proceeds of the Player Contract and that it had perfected that interest by filing the Financing Statements. There was no legitimate reason for RFF to cause those findings to appear in an arbitration award that it ostensibly was seeking for the sole purpose of obtaining an award against TJI and the Johnsons and realizing a recovery from the Johnsons' Ferrari and other property.

Rather, the reason that having a perfected security interest in the proceeds of the Player Contract would matter to a creditor such as RFF is the preferred treatment a perfected interest would afford it under a plan of reorganization for the Debtor. If RFF has a perfected security interest in the proceeds of the Player Contract, then RFF's claim would have to be treated as a secured claim. And if the class in which RFF's claim was placed declined to accept any plan of reorganization proposed by the Debtor, then RFF could argue that it is entitled to retain the lien on the Player Contract and receive deferred cash payments totaling the allowed amount of its secured claim, *see* 11 U.S.C. § 1129(b)(2)(A), while leaving other creditors with cents on the dollar, if anything. In effect, a perfected security interest in the Player Contract would force the Debtor to pay more of his salary to RFF—to the potential detriment of the Debtor's reorganization efforts and other creditors whose claims might be paid from the Debtor's future earnings.

Likewise, the inclusion of certain additional findings in the Arbitration Award—findings that again were taken directly from the Arbitration Brief—could negatively impact the Debtor's claims against RFF. The Arbitration Award includes a finding that RFF was exempt from the usury laws of California. Under California law, an interest rate of more than 10% per annum is usurious, Cal. Const. art. XV, § 1 (West 2016), and the effective interest rate on the Note was more than 42% per an-

num, meaning that RFF arguably had a reason to include the finding that it was exempt from California's usury laws in an arbitration award against the Johnsons and TJI on the Note. Similarly, although RFF did not assert any damages for fraud above what it sought on the Note, there is an explanation for its inclusion of the finding that the Johnsons "defrauded [RFF] by misrepresenting themselves and making promises [they] never intended to perform," Ex. 7 at 4—to use that finding of fraud in a nondischargeability proceeding against the Johnsons in any bankruptcy case they might commence. But there was no reason for RFF to cause a finding of fraud against TJI, a limited liability company, to appear in the Arbitration Award. After all, fraud-based nondischargeability claims are available only against individuals. *See* 11 U.S.C. § 523(a)(2). Furthermore, TJI's alleged fraudulent representations were made in the Note and related documents, and the only party that signed those documents on behalf of TJI was the Debtor as its Manager. All of this makes it appear that RFF's obtaining a finding of fraud against TJI had much more to do with the Debtor—including his claims against RFF—than it did with TJI.

The Arbitration Award was not served on the Debtor. Ex. 7 at 8. Nor was the Debtor served with the Petition to Confirm filed in the State Court Action on June 9, 2015. Exs. 8, 27–28. But it is apparent that counsel for the Debtor somehow learned of the Petition to Confirm soon after it was filed. Starting on June 14, 2015—five days after the filing of the Petition to Confirm—HLP attorneys began performing services "regarding automatic stay issue raised by state court action file[d] by RFF to enforce arbitration award against affiliates of Debtor," and by late June 2015, the Debtor's attorneys were drafting a cease and desist letter to Parcells, RFF's counsel in the State Court Action. Ex. 32 at 1.[12] There is no evidence that HLP sent a cease and desist letter to Parcells at that time. But then, a little over a month later, on or about August 2, 2015, RFF served a notice on the Johnsons and TJI that a hearing on the Petition to Confirm was scheduled for August 28, 2015. Ex. 9, 27–28. Although RFF did not serve the notice on the Debtor, his attorneys learned of it. On August 26, 2015, HLP attorney Daniel DeMarco ("DeMarco") completed and emailed to Parcells and Levinson a cease and desist letter (the "August 2015 Letter")—presumably the same one that HLP had begun preparing in late June 2015. Ex. 10; Ex. 32 at 3.

The August 2015 Letter was inaccurate in two respects. First, it stated that the October 2014 Letter had notified Parcells

12. HLP's time entries appear to be inconsistent with the overt suggestion—made in the Debtor's filings with the Court and in statements made by his attorneys during the Hearing—that they first discovered that the Arbitration Action was continuing against the Johnsons and TJI during a deposition of the Johnsons on August 21, 2015. *See* Ex. 10 ("In an August 21, 2015, deposition, we learned that RFF served papers in Michigan seeking to prosecute the Arbitration Action. Accordingly, we now know that after the Petition Date, RFF continued the Arbitration Action....."); Enf't Mot. at 3 ("In an August 21, 2015, deposition in the Bankruptcy Case, it was revealed that RFF served papers in Michigan seeking to prosecute the Arbitration Action. Accordingly, it is now clear that ... RFF continued the Arbitration Action ... [and that] an Arbitration Award was entered ....."); Tr. at 24:8–16 ("[O]n August 21 of this year, in connection with the conversion motion, there were depositions taken of the parents. And during the course of that deposition, it came to our attention that RFF was, in fact, prosecuting that State Court Action.....").

that "the Arbitration Action was stayed." Ex. 10 at 1. That is not quite right. The October 2014 Letter actually. stated only that the Arbitration Action "is stayed as to [the Debtor]," Ex. 2. Second, the August 2015 Letter advised Parcells that seeking to confirm the Arbitration Award was "prohibited by the automatic stay of Section 362(a)(1)." Ex. 10 at 3. As explained in the legal analysis set forth below, that statement is contrary to controlling Sixth Circuit case law, *Patton v. Bearden,* 8 F.3d 343 (6th Cir.1993), under which the § 362(a)(1) stay applies to actions against nondebtors only if the debtor commences an adversary proceeding and obtains an extension of the stay and an injunction pursuant to § 105(a) of the Bankruptcy Code, a step the Debtor has not taken. That said, in the August 2015 Letter, the Debtor's counsel made the well-taken point that another Sixth Circuit decision, *Amedisys, Inc. v. National Century Financial Enterprises, Inc. (In re National Century Financial Enterprises, Inc.),* 423 F.3d 567 (6th Cir.2005), supports the position that RFF had violated the automatic stay and would do so again if it continued to seek an order confirming the Arbitration Award. Ex. 10 at 3.

On August 27, 2015, DeMarco sent Parcells an e-mail asking him to "confirm you have withdrawn RFF's hearing request· in its state court action set for tomorrow morning, Friday, August 28, 2015." Ex. 11. There is no evidence in the record that Parcells responded to this e-mail. According to a letter that DeMarco sent Parcells and Levinson on October 23, 2015, "[a]t RFF's behest, [the State Court] held and conducted a hearing on August 28, 2015, and continued the August 28 Confirming Hearing until October 16, 2015, because RFF failed to comply with the applicable state court 30–day notice requirement." Ex. 14 at 1.[13]

As noted above, the Debtor filed the Enforcement Motion on September 3, 2015. Without citing *Patton* and without having commenced an adversary proceeding against RFF, the Debtor again took the position that RFF had violated § 362(a)(1). Enf't Mot. at 5, 7. The Debtor, however, also relied on § 362(a)(3) and *Amedisys* in support of his argument that RFF had violated the automatic stay and would commit further violations if it obtained an order confirming the Arbitration Award. *Id.* at 6–7.

In the Response, RFF took the position that it had not violated the automatic stay and that it would not be violating the automatic stay by continuing to prosecute the State Court Action. Among other things, RFF argued that it had neither committed nor would commit any act to exercise control over property of the Debtor's bankruptcy estate. Resp. at 1, 5–6

13. The Debtor contends that "RFF attempted to conduct the August 28, 2015 ... Hearing in violation of California Code of Civil Procedure Section 1290.4(b)(2), which prohibits such a hearing on less than 30 days' notice after the date of service of such notice." Enf't Mot. at 5 n.4. For its part, RFF states that an attorney, Eliot Teitelbaum, ·appeared on behalf of the Debtor at the August 28 hearing on the Petition to Confirm to argue for a continuance based on "procedural grounds." Resp. at 3; *see also* Ex. 32 (time entries in the First Fee Statement dated August 27–28, 2015 show that the Debtor's counsel had conferences and "[e]xchange[d] e-mails with E. Teitelbaum regarding preparation for 8/28/15 hearing on RFF petition to enforce arbitration award"); Doc. 138 (order granting the Debtor's application to employ Eliot Teitelbaum as an ordinary course professional). This raises the questions of: (1) whether counsel for the Debtor also made the State Court aware of the automatic stay and requested that the State Court Action be held in abeyance pending the filing of, and decision on, the Enforcement Motion; and (2) if not, why counsel did not do so.

(attempting to distinguish *Amedisys*). For the reasons stated in this section of the opinion, RFF is wrong as a matter of fact. And as explained below in the legal analysis, RFF is also wrong as a matter of law.

If there is any question that the automatic stay might apply, the prudent course is to seek relief from the stay before acting. Yet, despite the filing of the Enforcement Motion, RFF forged ahead with the Petition to Confirm. On October 16, 2015, the State Court entered both an order confirming the Arbitration Award "in all respects" and a judgment in favor of RFF. Ex. 12 at 2; Ex. 13. Under California law, this judgment would be given "the same force and effect as, and [would be] subject to all the provisions of law relating to, a judgment in a civil action," Cal.Code Civ. P. § 1287.4 (West 2015), including the law of issue preclusion as applied to parties that are in privity with one another. *See, e.g., Sartor v. Superior Court,* 136 Cal. App.3d 322, 187 Cal.Rptr. 247, 250 (1982). By obtaining the order confirming the Arbitration Award and a judgment of the State Court, RFF again engaged in an act to exercise control over property of the Debtor's bankruptcy estate.

## V. Legal Analysis

Subject to certain exceptions not applicable here, the filing of a bankruptcy petition triggers an automatic stay that both protects the debtor and "safeguards property of the bankruptcy estate." *In re Nicole Gas Prod., Ltd.,* 519 B.R. 723, 736 (Bankr.S.D.Ohio 2014); *see also* 11 U.S.C. § 362(a). Among other things, § 362(a) stays:

(1) the commencement or continuation ... of a judicial, administrative, or other action or proceeding against the debtor that was ... commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; [and]

. . . .

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

11 U.S.C. § 362(a)(1), (3).

The automatic stay applies to arbitration proceedings. *See ACandS, Inc. v. Travelers Cas. & Sur. Co.,* 435 F.3d 252, 259 (3d Cir.2006); *see also In re Bunting Bearings,* 302 B.R. 210, 213 (Bankr. N.D.Ohio 2003) ("[T]he scope of the automatic stay has been held to encompass postpetition proceedings conducted pursuant to an arbitration clause."). And because the stay is automatic, "the debtor does not have to make any formal request that it be issued or that it apply to a particular proceeding." *ACandS,* 435 F.3d at 259. "Although [non-bankruptcy] court judges generally refrain from proceeding once they are made aware of a bankruptcy filing, the burden is on the creditor not to seek relief ... in violation of the stay." *In re Sutton,* 250 B.R. 771, 774 (Bankr. S.D.Fla.2000).

The automatic stay not only serves to give the debtor a breathing spell, but it also "protects creditors by preventing particular creditors from acting unilaterally in self-interest ... to the detriment of other creditors." *Mar. Elec. Co. v. United Jersey Bank,* 959 F.2d 1194, 1204 (3d Cir.1991); *see also Chao v. Hosp. Staffing Servs., Inc.,* 270 F.3d 374, 382–83 (6th Cir.2001) ("The stay helps '... prevent[ ] a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.'" (quoting *Holtkamp v. Littlefield (In re Holtkamp),* 669 F.2d 505, 508 (7th Cir.1982))) (internal quotation marks omitted). "The purpose of the automatic stay is not to ...

ultimately prevent the exercise of the available rights of any party ... [but instead is] to prevent any creditor from becoming a self-determined arbiter of what constitutes property of the estate and what actions are permitted or prohibited by the stay." *Clark v. United States (In re Clark)*, 207 B.R. 559, 565–66 (Bankr. S.D.Ohio 1997).

## A. Section 362(a)(1)

By its terms, § 362(a)(1) prohibits the commencement or continuation of a proceeding only if it is a proceeding "against the debtor." 11 U.S.C. § 362(a)(1). As noted above, after the Petition Date, RFF continued the Arbitration Action—and commenced the State Court Action—only against TJI and the Johnsons, not against the Debtor. Despite this, the Debtor argues that RFF's conduct in prosecuting the Arbitration Action and the State Court Action against TJI and the Johnsons "plainly violate[d]" § 362(a)(1). Enf't Mot. at 7. The Debtor claims this conduct is a plain violation of the stay "under prevailing Sixth Circuit law," Reply at 2, but he errs in two ways. First, the only Sixth Circuit case law the Debtor cites is *Amedisys*, 423 F.3d 567, which addresses a violation of § 362(a)(3), rather than (a)(1). Second, as explained below, the Debtor's argument is contrary to prevailing Sixth Circuit case law addressing § 362(a)(1), including *Patton*, 8 F.3d 343.

■■■ "The Sixth Circuit has made it abundantly clear that the § 362(a)(1) stay of acts 'against the debtor' is to be strictly construed." *In re Cincom iOutsource, Inc.*, 398 B.R. 223, 226 (Bankr.S.D.Ohio 2008) (citing *Patton*, 8 F.3d 343). It is axiomatic that § 362(a)(1) does not automatically give rise to a general stay of creditors' rights to pursue nondebtor codefendants, even those with some relationship to the debtor. *See Lynch v. Johns-*

*Manville Sales Corp.*, 710 F.2d 1194, 1196 (6th Cir.1983) ("It is universally acknowledged that an automatic stay of proceeding accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the Chapter 11 debtor."); *In re Irwin*, 457 B.R. 413, 418 (Bankr. E.D.Pa.2011) (noting the "black letter bankruptcy principle that § 362(a) does not create a general, automatic stay of a creditor's right to assert claims against non-debtor parties who are related to the debtor in some fashion"). Instead, actions against nondebtor codefendants may be stayed under § 362(a)(1) only in "unusual circumstances," which can arise where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Am. Imaging Servs., Inc. v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.)*, 963 F.2d 855, 861 (6th Cir.1992) (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.1986)); *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 314 (6th Cir.2000) ("Extending a stay to nonbankrupt co-defendants is justified only in 'unusual circumstances.' "). "Unusual circumstances" have been found:

(1) when an indemnification or contribution relationship creates an identity of interests between the debtor and the non-debtor defendant;

(2) when the proceeding imposes a substantial burden of discovery on the debtor; or

(3) when the proceeding would have a potential preclusive effect that forces the debtor to participate in the proceeding as if the debtor were a party.

*In re Jefferson Cty., Ala.*, 491 B.R. 277, 284 (Bankr.N.D.Ala.2013) (citing cases);

*Sudbury, Inc. v. Escott (In re Sudbury, Inc.)*, 140 B.R. 461, 464 (Bankr.N.D.Ohio 1992) (same).

In some jurisdictions, it is an open question whether the presence of unusual circumstances means that actions against nondebtors are subject to the § 362(a)(1) stay automatically or whether that stay applies only if the bankruptcy court extends the stay to actions against nondebtors using its powers to issue an injunction under § 105(a) of the Bankruptcy Code. *See Jefferson Cty.*, 491 B.R. at 284 n. 1 (comparing cases). But this is not an open question in the Sixth Circuit. In *Patton*, the Sixth Circuit made it clear that the unusual circumstances test does not mean that the stay applies automatically by its terms to actions against nondebtors. Instead, according to the Sixth Circuit, the presence of unusual circumstances allows an extension of the stay only through an injunction issued under § 105(a):

> Some courts have held that the debtor's stay may be extended to non-bankrupt parties in "unusual circumstances." ... It should be noted that such extensions, although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court after hearing and the establishment of unusual need to take this action to protect the administration of the bankruptcy estate. Even if we were to adopt the unusual circumstances test, the bankruptcy court would first need to extend the automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105.

*Patton*, 8 F.3d at 349; *see also Amedisys*, 423 F.3d at 577 ("[*Patton* and *Parry* ] note that, by extending the stay beyond its statutory terms, the bankruptcy court is not acting under § 362(a), but is instead issuing an order in equity [under § 105]."); *Saleh v. Bank of Am., N.A. (In re Saleh)*, 427 B.R. 415, 420 (Bankr.S.D.Ohio 2010) ("In the Sixth Circuit, [an injunction to extend the automatic stay to nondebtor codefendants] has been granted in limited circumstances ... using a court's inherent powers emanating from Bankruptcy Code Section 105(a).... The Sixth Circuit clarifies that the granting of a § 105(a) injunction is a radical measure to be granted only in 'unusual circumstances.' ").[14] The Debtor, however, has never sought an injunction extending the § 362(a)(1) stay to the proceedings against TJI and the Johnsons.

Most cases regarding § 362(a)(1)'s application to litigation against nondebtor codefendants involve a prospective determination of whether the automatic stay applies. *See, e.g., Klarchek Family Trust v. Costello (In re Klarchek)*, 508 B.R. 386 (Bankr. N.D.Ill.2014) (motion to enforce the automatic stay as to a recently-filed action); *In re Howrey LLP*, 492 B.R. 19 (Bankr. N.D.Cal.2013) (creditor seeking determination that stay does not apply, or alternatively, seeking relief from stay), *aff'd*, No. C 13–02700 SBA, 2014 WL 3899487 (N.D.Cal. Aug. 8, 2014); *Jefferson Cty.*, 491 B.R. 277 (same). But RFF chose not to seek a determination of the automatic stay's application to the Arbitration Action and State Court Action or to seek relief

---

**14.** Other circuits as well have found that a preliminary injunction is required to extend § 362(a)(1) to actions against nondebtor parties. *See Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086, 1096 (9th Cir.2007); *Nat'l Bank of Ark. v. Panther Mountain Land Dev., LLC (In re Panther Mountain Land Dev., LLC)*, 686 F.3d 916, 926 (8th Cir.2012) ("[I]n a situation such as this, where the proposed action involves only third parties and no estate property, and where an 'unusual-circumstances' 'exception' would be needed to justify extension of the automatic stay, § 105 is the more appropriate source of authority for assessing the propriety of a stay.").

from the stay. Instead, RFF proceeded to prosecute the actions without any notice to the Debtor. Although it turns out that the Debtor's counsel was aware of the Arbitration Award soon after it was entered and of the Petition to Confirm soon after it was filed, there is no evidence that RFF knew this. After all, RFF failed to provide the Debtor notice of any of the proceedings. Given that RFF failed to apprise the Debtor of its actions, it is difficult to understand how RFF could have expected the Debtor to seek a stay under § 105. And the Court recognizes the potential problem with requiring a § 105 injunction before § 362(a)(1) can apply in those cases where the creditor fails to give notice to the debtor that it is continuing the action against the debtor's non-bankrupt codefendants.

But any argument here that the Debtor was unable to seek a § 105 stay because he had no notice of RFF's actions is not well taken. Despite the suggestion by the Debtor and his counsel that they did not know about the Arbitration Award and the Petition to Confirm until August 2015, HLP's First Fee Statement indicates that they had been aware of the continuation of the Arbitration Action since June 2015—after the Award was entered, but over two

months before they sent the cease and desist letter and filed the Enforcement Motion, and over four months before the Arbitration Award was confirmed by the State Court. Accordingly, the Court questions why the Debtor did not file a suggestion of stay in the State Court or seek a § 105 stay in this Court at that time, or why, when the Debtor's local counsel appeared at the initial hearing on the Petition to Confirm the Arbitration Award, he apparently made only a procedural argument to continue the hearing, rather than inform the State Court of the Debtor's pending Enforcement Motion. Even though the Arbitration Award had already been granted by June 2015, the Debtor perhaps could have prevented the Arbitration Award from being confirmed by the State Court.

■■■■■ In any event, because the Debtor has not sought an injunction to extend the automatic stay to TJI and the Johnsons, the automatic stay under § 362(a)(1) does not apply to the continuation of the Arbitration Action or the State Court Action against them. Even if the Debtor were now to argue that unusual circumstances warranted an extension of the stay to TJI and the Johnsons,[15] the

15. Had the Debtor actually sought an injunction under § 105, the Court almost certainly would have granted it, at least in part. As noted above, unusual circumstances warranting application of the automatic stay to an action against a nondebtor exist where there is an identity of interests between the debtor and the nondebtor. *A.H. Robins*, 788 F.2d at 999. "A sufficient identity of interests between the debtor and solvent codefendant is . . . created when 'codefendant liability is directly attributable to the debtor.'" *USCO S.p.A. v. ValuePart, Inc.*, No. 2:14-CV-02590-JPM, 2015 WL 4601192, at *9 (W.D.Tenn. July 29, 2015) (quoting *Lindsey v. O'Brien (In re Dow Corning)*, 86 F.3d 482, 493 (6th Cir. 1996)). RFF sought and obtained a judgment against TJI—on behalf of which the Debtor signed as "manager"—for breach of contract

and fraud. Even while acting on behalf of the corporation, corporate officers and directors are, in general, liable for the torts they participate in, direct, or otherwise authorize. *See Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir.1985); *A & M Records, Inc. v. M.V.C. Distrib. Corp.*, 574 F.2d 312, 315 (6th Cir.1978). It is difficult for the Court to conceive how a company could be held liable for fraud in connection with signing a contract if the agent who signed on behalf of the company was not the one who perpetrated the fraud. *See Sudbury*, 140 B.R. at 463 ("The claims in both actions are generally premised on the defendants' alleged fraud while acting as officers or directors of the Debtor. . . . [I]t is not plausible that the defendants in these actions could be found liable

Court has found no authority to grant such retroactive relief. In fact, the case law is to the contrary. *See Chugach Timber Corp. v. N. Stevedoring & Handling Corp. (In re Chugach Forest Prods., Inc.),* 23 F.3d 241, 247 n. 6 (9th Cir.1994) ("[The debtor] never requested that the bankruptcy court stay [the creditor's action]. Because [the debtor's] subsequent request for damages is not analogous to the prospective requests for an injunction found in typical 'unusual circumstances' cases, we think application of the exception is particularly inappropriate in this case."). RFF therefore cannot be held liable for violating § 362(a)(1). The Debtor's reliance on that subsection is misplaced, and his failure to acknowledge the Sixth Circuit's controlling decision in *Patton* was improper.

**B. Section 362(a)(3)**

▇ "The automatic stay of § 362(a) applies by its terms not only to actions against the debtor," *Amedisys,* 423 F.3d at 578, but also to acts to "exercise control over property of the estate," 11 U.S.C. § 362(a)(3). And as the Court explains in detail below, RFF undertook acts to exercise control over property of the Debtor's bankruptcy estate, thereby violating § 362(a)(3) of the Bankruptcy Code.

▇ The term "property of the estate" is expansive and encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), and "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." *Klarchek,* 508 B.R. at 395 (quoting *In re Yonikus,* 996 F.2d 866, 869 (7th Cir.1993), *abrogated on other grounds by Law v. Siegel,* ——

U.S. ——, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014)).

▇ Section 362(a)(3)'s prohibition of acts to "exercise control over" property of the estate applies not only to overt physical actions, such as repossessing vehicles (for which RFF attempted to obtain relief from the stay), but also to more intangible acts to exercise control over property of the estate. For example, it is well recognized that actions against non-debtors that would have an "adverse impact" upon the property of the estate are subject to the automatic stay under § 362(a)(3). *See, e.g., Amedisys,* 423 F.3d at 578 (quoting *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 392 (2nd Cir.1997)); *Official Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines, Inc.),* 928 F.2d 565, 574 (2d Cir.1991) ("If [the creditor] were permitted to take a worthless stock deduction ... it would have an adverse impact on [the debtor's] ability to carryforward its [net operating loss]. Accordingly, despite the fact that [the creditor's] action is not directed specifically at [the debtor], it is barred by the automatic stay as an attempt to exercise control over property of the estate."); *Klarchek,* 508 B.R. at 397 ("[G]iven the potential adverse impact on property of the estate of the action, the action must be stayed pursuant to section 362(a)(3)."). Section 362(a)(3) "reaches farther [than other provisions in § 362], encompassing every effort to 'exercise control over property of the estate.'" *Klarchek,* 508 B.R. at 396 (quoting *Nat'l Tax Credit Partners, L.P. v. Havlik,* 20 F.3d 705, 708 (7th Cir.1994)).

▇ As shown below, the Debtor's rights under the Player Contract and his

___

to Plaintiffs except on facts that would impose liability on the Debtor. Debtor asserts credibly that under these circumstances its liability

may be determined on collateral estoppel principles in Plaintiffs' actions.").

claims against RFF are property of his bankruptcy estate, and RFF's continued prosecution of the Arbitration Action and State Court Action constituted acts to exercise control over that property in violation of § 362(a)(3).

## 1. The Debtor's Rights Under the Player Contract

The Debtor's rights under the Player Contract are part of his bankruptcy estate. *See Hutchins v. Fordyce Bank & Tr. Co. (In re Hutchins)*, 211 B.R. 325, 327 (Bankr.E.D.Ark.1997) ("Upon the filing of a bankruptcy case, contracts held by the debtor, including employment contracts, become property of the estate."); *see also Neuton v. Danning (In re Neuton)*, 922 F.2d 1379, 1382–83 (9th Cir.1990) (holding that a debtor's contingent interest in future income from a spendthrift trust is property of the bankruptcy estate); *Klarchek*, 508 B.R. at 395 ("A debtor's contingent interest in future income has consistently been found to be property of the bankruptcy estate."); 11 U.S.C. § 1115 ("[P]roperty of the estate includes ... earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted....").

In fact, the Player Contract, which entitles the Debtor to millions of dollars of future income, is by far the most valuable asset of the Debtor's bankruptcy estate. It has become clear that RFF's goal both before the Petition Date and afterward has been to be paid in full on its claim out of the salary the Debtor receives under the Player Contract. In and of itself, this is obviously neither improper nor unlawful. But by taking deliberate acts that resulted in the inclusion of findings in the Arbitration Award to the effect that it had a perfected security interest in the Player Contract—and by then seeking and obtaining from the State Court what essentially amounts to a declaratory judgment that the Note is secured by the Player Contract and that its security interest was perfected by the filing of the Financing Statements—RFF acted to exercise control over the Player Contract in violation of the automatic stay. If the Arbitration Award, the State Court order confirming it, and the State Court judgment are not voided, RFF's attempt to exercise control over the Player Contract might ultimately take the form of an argument by RFF that a plan of reorganization for the Debtor could be confirmed only if RFF retains its lien on the Player Contract and receives deferred cash payments totaling the allowed amount of its secured claim—even if this means leaving other creditors with little or no recovery. In proceeding to prosecute the Arbitration Action and State Court Action and including findings regarding RFF's rights vis-à-vis the Player Contract, RFF "act[ed] unilaterally in self-interest to obtain payment from [the Debtor] to the detriment of other creditors." *Mar. Elec. Co.*, 959 F.2d at 1204. Such conduct flouted § 362(a)(3) and thereby deprived the Debtor of the protection of the automatic stay.

*Amedisys* makes this clear. In *Amedisys*, the Chapter 11 debtors were National Century Financial Enterprises, Inc. ("NCFE") and its subsidiaries. Before the bankruptcy filing, a creditor of NCFE, Amedisys, Inc. ("Amedisys"), sued JP Morgan Chase Bank ("JP Morgan") and NCFE and certain of its subsidiaries in federal district court, seeking the return of accounts receivable held by JP Morgan in the name of an NCFE entity. After NCFE filed its bankruptcy petition, the district court case was transferred to the bankruptcy court as an adversary proceeding, and Amedisys filed an amended complaint seeking, among other things, a declaratory judgment that the funds held by

JP Morgan be impressed with a constructive trust in favor of Amedisys. *See Amedisys*, 423 F.3d at 570–71. But Amedisys thereafter filed a separate state court action in Louisiana against JP Morgan and other nondebtor parties, alleging substantially the same causes of action without joining NCFE as a party. Arguing that Amedisys was seeking possession of property of its bankruptcy estate, NFCE filed a motion in the bankruptcy court for an order enforcing the automatic stay and halting the Louisiana action. *Id.* at 572. The Sixth Circuit held that Amedisys's state court action violated § 362(a)(3) even though it did not name NCFE as a defendant, because the action against JP Morgan in the state court "[sought] to obtain possession of the disputed accounts receivable" which the court found "likely constitute[d] property of the bankruptcy estate." *Id.* at 575. Even though only some of Amedisys's claims sought the disputed property, "every count in the complaint require[d] the court to adjudicate whether Amedisys had a rightful claim to that property," and such an adjudication would adversely impact property of the estate. *Id.*

Importantly, the imposition of a constructive trust by a Louisiana court would not have had the immediate effect of removing property from NCFE's bankruptcy estate (in the way that draining a bank account would) any more than a finding that the Note is secured by the Player Contract would do so. Instead, the bankruptcy court that had jurisdiction over the property of NCFE's bankruptcy estate would first have to give effect to the Loui-

siana judgment before the constructive trust would have negatively affected property of the NCFE's estate. The Sixth Circuit expressed concern about impeding the ability of bankruptcy courts to manage their cases and to exercise their exclusive jurisdiction over property of the estate: [16]

> [T]he bankruptcy court's determination that the accounts receivable are part of the bankruptcy estate strongly supports the conclusion that the automatic stay was properly enforced. It is the bankruptcy court's province to identify the property of the bankruptcy estate.... Reversing the lower courts' conclusions that the automatic stay applies, at a time when the bankruptcy court's determination of the ownership of the accounts receivable remains a live issue [on] appeal, would impede the bankruptcy court's role in managing the bankruptcy case.

*Amedisys*, 423 F.3d at 577.[17] The Sixth Circuit found that, whether or not Amedisys could ultimately exclude the accounts receivable from NCFE's bankruptcy estate, "[a] separate civil action for constructive trust, initiated postpetition, is an inappropriate forum for Amedisys' assertion that it has a rightful claim to the [property]." *Id.* at 576 n. 6. To do so is to violate § 362(a)(3) by "mak[ing] an end run around the bankruptcy process to obtain a ... judgment." *Id.*

Just so here. While the Debtor ostensibly was not a party to the arbitration or the State Court Action, the Arbitration Award includes findings—that the Note is secured by the Assignment and the Letter

---

16. *See Chao,* 270 F.3d at 383 ("[I]f the automatic stay applies to an action directed at the debtor or its property, jurisdiction is exclusive in the bankruptcy court.").

17. *See also Jefferson Cty.,* 491 B.R. at 287 ("[The] fraud allegations may affect the claims allowance, subordination, and adjust-

ment of debt processes in [the bankruptcy court].... [The action] also represents an attempt to fix the amount of [the creditor's claim] via outside litigation even though the bankruptcy court is the more efficient forum for making such a determination.").

Agreement (and thus the Player Contract)—that could be used to achieve RFF's goal of receiving a full recovery from the Player Contract. For if RFF succeeded in having those findings apply in this Court, the Debtor's income, which is property of his estate, would all need to be paid to RFF to fully satisfy its secured claim before it could be paid to any other creditors. It is unnecessary, however, to determine whether RFF could successfully achieve this result. Just as a civil action outside the bankruptcy court was an improper arena for Amedisys to seek an adjudication of issues bearing on property of NCFE's estate, the Arbitration and State Court Actions were inappropriate forums for RFF's assertion that it has a perfected security interest in the Player Contract. Instead, that issue must be decided by this Court.

Under substantially similar circumstances, the Sixth Circuit in *Amedisys* held that § 362(a)(3) applied directly and that there was no need to conduct the "unusual circumstances" analysis that is used under § 362(a)(1) when an action is ostensibly against a nondebtor. The Court thus finds that even though the Arbitration Award was nominally against the Johnsons and TJI, RFF violated § 362(a)(3) when it sought to exercise control over property of the Debtor's estate by including in the Award findings that RFF has a perfected security interest in the Player Contract.

### 2. The Debtor's Claims Against RFF

▪ The Debtor's claims against RFF also are property of his bankruptcy estate. "As the Sixth Circuit has recognized, 'it is well established that "interests of the debtor in property" include "causes of action," making causes of action existing as of the commencement of the bankruptcy case property of the estate under § 541(a)(1).'" *In re Nicole Gas Prod., Ltd.,* 519 B.R. 723,

738 (Bankr.S.D.Ohio 2014) (quoting *Bauer v. Commerce Union Bank,* 859 F.2d 438, 441 (6th Cir.1988); *see also Cottrell v. Schilling (In re Cottrell),* 876 F.2d 540, 542 (6th Cir.1989) ("It is apparent ... that the legislative intent of [11 U.S.C. § 541] was to extend the definition of property to include all assignable and nonassignable causes of action[.]"). Because they existed as of the Petition Date, the counterclaims the Debtor asserted against RFF in the Arbitration are property of his bankruptcy estate. *See Tyler v. DH Capital Mgmt., Inc.,* 736 F.3d 455, 462 (6th Cir.2013) ("[A]ll causes of action that ... could have been brought pre-petition are property of the estate."); *Mich. First Credit Union v. Smith (In re Smith);* 501 B.R. 325, 325–26 (Bankr.E.D.Mich.2013) (holding that counterclaims arising prepetition are property of the bankruptcy estate).

RFF exercised control over the Debtor's causes of action when, "[w]ithout requesting relief from the automatic stay, [it] attempted to place the determination of the [the debtor's] cause[s] of action in a forum outside the bankruptcy court." *In re Sw. Equip. Rental, Inc.,* No. 1–88–00033, 1990 WL 129972, at *3 (Bankr.E.D.Tenn. Feb. 8, 1990). The Debtor's claims against RFF in the Arbitration Action—and again in the Adversary Proceeding—allege that: (1) RFF "duped" the Debtor into entering into the loans; (2) RFF "is not exempt from [the usury laws] pursuant to the California Constitution or California Finance Code, Section 22000 *et seq.;*" (3) RFF engaged in fraudulent conduct in violation of California's Unfair Business Practices Act; and (4) the Note is procedurally and substantively unconscionable and unenforceable. Exs. 5 & 26. And despite the fact that RFF knew these were live issues in the Debtor's bankruptcy case, it proceeded with the Arbitration Action against TJI and the Johnsons and pursued a judgment that found, among other things, that:

- TJI and the Johnsons defrauded RFF by making certain representations and warranties in the Note, Security Agreement, Assignment, and Letter Agreement;[18] and

- RFF is "exempt from usury laws in accordance with [the California Constitution] and California Finance Code, Section 22000 *et seq.*"

Exs. 7 & 29. Such findings are completely at odds with the Debtor's allegations in his counterclaims and would—if given effect—render the Debtor's counterclaims valueless.[19] *Klarchek,* 508 B.R. at 397 ("[A]n action, though it does not name the debtor as a party, is nonetheless subject to the automatic stay when what it seeks may have the effect of collaterally estopping the estate's claims."); *Sw. Equip. Rental,* 1990 WL 129972, at *3 ("The word 'control' means to exercise authority or dominating influence over; direct; regulate; to hold in restraint; check.... By its action, [the creditor] seeks to 'direct,' 'regulate,' 'restrain,' or 'check' the trustee's cause of action through utilization of the I.C.C. adjudicative process."). Including these findings in the Arbitration Award was an attempt to thwart the Debtor's claims and exercise control over property of the Debtor's estate. *Klarchek,* 508 B.R. at 397; *Sw.*

*Equip. Rental,* 1990 WL 129972, at *4 ("[T]he court is convinced that [the creditor's] administrative action filed postpetition against the bankruptcy estate in another forum concerning a prepetition claim of the estate is an act to exercise control over property of the estate.").

To succeed on his counterclaim against RFF that is based on usury, the Debtor would of course need to establish that RFF was subject to California's usury laws. And the Debtor would need to show that RFF had defrauded him in order to succeed on his fraud-based claims. It is difficult to see how the Debtor could show that RFF was guilty of fraud if, as the Arbitration Award finds, it was RFF that had been defrauded by the Johnsons and TJI. The Court says this for two reasons. First, as previously noted, the fraudulent representations that RFF alleges TJI made in the Note and related documents were made by means of the Debtor's signature on those documents on behalf of TJI. Thus, if TJI committed fraud, then so did the Debtor. Second, before it obtained the Arbitration Award, RFF itself acknowledged that the Debtor alleges that "he relied on his parents *and they were misled.*" Doc. 151 at 3 (emphasis added);

---

**18.** As noted above, the Debtor is the only one of the Borrowers that signed the Assignment and Letter Agreement.

**19.** As the Court found above, RFF sought and obtained an order confirming the Arbitration Award and a *judgment in its favor.* Under California law, that judgment is subject to all of the legal principles governing a civil judgment and would be given "the same force and effect as, and [would be] subject to all the provisions of law relating to, a judgment in a civil action." Cal.Code Civ. P. § 1287.4 (West 2015); *see, e.g., Sartor,* 187 Cal.Rptr. at 250 ("[T]he judgment confirming the arbitration award constitutes a final judgment on the merits."). This includes the law of issue preclusion as applied to parties that are in privity

with one another—which conceivably could include the Debtor as the Manager of TJI, especially given that the Debtor signed the Note both in his personal capacity and as the Manager of TJI. *Cf. id.* (holding that arbitration proceeding's decision on liability of agents for corporation barred relitigation against the corporation itself because "a corporation may act only through its agents); *Fin. Fed. Credit Inc. v. Smith,* No. Civ. A. H–04–4293, 2005 WL 2121556, at *5 (S.D.Tex. Aug. 31, 2005) (holding that an individual defendant was in privity with a limited partnership where the individual defendant (1) was the manager of a limited liability company that was the general partner of the limited partnership and (2) a guarantor of the limited partnership's obligations on a note).

*see also* Doc. 184 at 5 ("In his initial filings, and through the statements of his counsel to this Court, the Debtor presented himself as the unwitting victim of unscrupulous lenders that had preyed upon his parents."). In other words, RFF has recognized that the Debtor's fraud-based claims against RFF rely in part on his contention that RFF defrauded his parents, not the other way around. If it instead was the Johnsons that defrauded RFF, the Debtor's fraud-based claims against RFF would be impaired, if not totally defeated. For although it is theoretically possible for parties on the opposite side of a lending arrangement to defraud one another, it is hard to conceive how that could be so on the facts of this case. In sum, because the finding that RFF was defrauded by TJI and the Johnsons and the finding that RFF is exempt from California's usury laws are inconsistent with the fraud and usury-based claims that the Debtor's bankruptcy estate has against RFF, the inclusion of the findings in the Arbitration Award constituted an act to exercise control over estate property.

## C. RFF's Attempts to Justify Its Conduct Are Unavailing.

In the Response, RFF asserts four arguments for why it did not violate the automatic stay, none of which has any merit. The first two arguments—that the "continuation of the Arbitration Action ... (1) does not continue an action or proceeding against the Debtor, or seek to recover a claim against the Debtor; [and] (2) ... is not enforcement, against the Debtor or property of the estate, of a pre-petition judgment," Resp. at 1—go only to § 362(a)(1) and (2) of the Bankruptcy Code, respectively. The Court addressed § 362(a)(1) above, concluding that it does not apply here. The argument based on § 362(a)(2), which stays "the enforcement,

against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title," 11 U.S.C. § 362(a)(2), is a true red herring because the Debtor has never relied on § 362(a)(2). Because they relate only to § 362(a)(1) and (2), RFF's first two arguments do nothing to alter the Court's conclusion that RFF violated § 362(a)(3).

The third argument that RFF made in the Response—that the "continuation of the Arbitration Action ... is not an act ... to exercise control over property of the estate," *id.*—is contrary to the Court's findings of fact. In support of its third argument, RFF unconvincingly argues that *Amedisys* supports its position, stating that the "Sixth Circuit [in *Amedisys* ] affirmed an order enforcing the automatic stay against the underlying litigation because that action was an act to *obtain possession of property of the bankruptcy estate* within the meaning of section 362(a)(3) of the Bankruptcy Code" and that "[w]here, as here ... the Debtor is not a defendant and there is no effort *to obtain property of the Debtor's estate*, the clear holding of [*Amedisys* ] is that the automatic stay does not apply by its very terms." Resp. at 6 (emphasis added). But RFF reads *Amedisys* too narrowly. True, the Sixth Circuit held that the state-court action at issue in that case violated § 362(a)(3) because the action was one to "obtain possession" of property of the estate. *Amedisys*, 423 F.3d at 569. The Sixth Circuit, however, certainly did not limit the applicability of § 362(a)(3) to acts designed to obtain possession of property of the estate or to other acts that diminish the value of property of the estate. Nor would the Sixth Circuit have been in a position to do so given that § 362(a)(3) by its terms also applies to acts designed to exercise control over property of the estate. *See In re Elrod,* 523 B.R. 790

(Bankr.W.D.Tenn.2015). *In Elrod*, the court correctly noted that "if an act to possess or control property of the estate only violated § 362(a)(3) when it diminished the value of the bankruptcy estate, there would be nothing to stop a secured creditor from exercising its self-help remedies to foreclose on collateral in which the debtor has no equity." *Id.* at 803. Creditors would, the court pointed out, "rely on their own opinion of the debtor's bankruptcy to determine whether foreclosure would cause damage to the bankruptcy estate." *Id.* The *Elrod* court concluded that interpreting § 362(a)(3) and *Amedisys* to apply only when estate property is diminished "completely disregards the essential and fundamental procedural role that the automatic stay plays in the bankruptcy process." *Id.*

Fourth, RFF also relied in the Response on the fact that "the Debtor has at no time asserted any interest (legal or equitable) in TJI itself, either in the Motion [to Enforce] or his schedules, as amended." Resp. at 2 n. 1. That statement is true as far as it goes. *See* Doc. 251 at 7 (the Debtor's schedule of personal property in which he states that he "does not claim any interest in [TJI], although some documents may exist that suggest otherwise"). But the statement does not go far enough to absolve RFF of liability for obtaining findings of fraud against TJI. As discussed above, the reason the findings of fraud against TJI could undermine the Debtor's fraud-based claims against RFF is because the Debtor signed the Note and other documents on behalf of TJI, not because he may have an equity interest in TJI. To summarize, the arguments that RFF makes in the Response are wholly unconvincing.

During the Hearing, RFF made several additional arguments for why it should not be held liable for violating the automatic stay. Again, none of these arguments is well-taken. RFF's state-court attorney, Parcells, was not present at the Hearing, so the Court asked RFF's bankruptcy counsel, Levinson, why RFF failed to provide the Debtor with notice of the continuation of the Arbitration Action. According to Levinson, RFF's failure arose out of a concern that giving the Debtor notice would violate the automatic stay. Tr. at 46. In other words, Levinson's explanation for RFF's failure to give the Debtor notice boils down to this: Although continuing the Arbitration Action did not violate the automatic say, notifying the Debtor that it was doing so (i.e., that it was taking an action that did not violate the stay) itself would have violated the stay. Tr. at 46. There is no evidentiary support for this explanation, and it strains credulity to believe that RFF was concerned that it would be violating the automatic stay by providing notice of an act that itself—in RFF's view—would not violate the stay.

Levinson also argued that "there's no finding of the arbitrator that Jack Johnson's assets are secured here." Tr. at 45. When the Court pointed out that this was flatly wrong, Levinson switched to the explanation that there was "no holding to that effect" and "we are not looking to enforce that against the Debtor." Tr. at 46. When the Court then pointed out that findings can be given preclusive effect, Levinson argued that the findings in the Arbitration Award could not be given preclusive effect against the Debtor because RFF had not given the Debtor notice and that, given this lack of notice, RFF had not violated the stay despite the inclusion of a finding that the Player Contract secured RFF's claim and the finding that RFF's security interest was perfected by the filing of the Financing Statements. *Id.* By application of this logic, a creditor could obtain a postpetition judgment against a debtor outside of the bankruptcy court

and, as long as the creditor did not give any notice to the debtor, could not be held to have violated the automatic stay. This is not and cannot be the law.

■ RFF's argument that the Debtor could not be bound by the Arbitration Award because he was no longer a party to the Arbitration Action and because RFF did not intend that the Arbitration Award's findings be given preclusive effect against the Debtor, Tr. at 39, 44, is unconvincing for several other reasons. First, when asked by the Court whether RFF "would be willing to sign a stipulation saying that ... the California proceeding ha[s] no preclusive effect whatsoever against [the Debtor]," counsel for RFF indicated it would, but only "[w]ith a couple more caveats." Tr. at 40. Second, an arbitration award or judgment may violate the automatic stay even if a court ultimately were to decide that it could not give its findings preclusive effect. *See Klarchek*, 508 B.R. at 397 ("[E]ven where such a collateral [estoppel] argument may be unavailing, the estate cannot simply be a bystander ... and risk potential prejudice."); *Jefferson Cty.*, 491 B.R. at 294–95 ("Even if ... an actual collateral estoppel claim might not succeed, the [Debtor's] legal position could still be adversely impacted ...."); *see also Amedisys*, 423 F.3d at 576 n.6 ("It is unnecessary to determine whether Amedisys, if it prevailed in the Louisiana action, could successfully obtain exclusion of the accounts receivable from the bankruptcy estate [under controlling Sixth Circuit Law]. A separate civil action ... initiated postpetition, is an inappropriate forum for [its] assertion that it has a rightful claim to the funds...."). And while there might be reasons why the Debtor and his estate would not be bound by the Arbitration Award's findings, the threat of issue preclusion is not nonexistent. *See Phillips v. Phillips (In re Phillips)*, 500 B.R. 570, 577

(8th Cir. BAP 2013) (affirming bankruptcy court's decision to give preclusive effect to a finding regarding ownership of contested assets in a postpetition state court judgment against nondebtor codefendants); *cf. Adler v. Ng (In re Adler)*, 395 B.R. 827, 830 (E.D.N.Y.2008) (reversing bankruptcy court's ruling that "findings of fraud in a state court action against corporations owned by Debtor had a binding effect in the bankruptcy proceeding against Debtor and prevented Debtor from arguing that he did not obtain his debt through fraud"). Finally, RFF's assurances that it never intended to seek to use the Arbitration Award against the Debtor means little coming after RFF got caught with its hand in the proverbial cookie jar.

## D. Willfulness of the Automatic Stay Violation

■ Bankruptcy courts have the authority to enforce the automatic stay by levying sanctions against parties who take actions in violation of the stay. 11 U.S.C. § 362(k)(*l*). In "appropriate circumstances, [the individual injured by the violation] may recover punitive damages." *Id.* A violation of the automatic stay is willful under § 362(k) if "the creditor deliberately carried out the prohibited act with knowledge of the debtor's bankruptcy case." *In re Printup*, 264 B.R. 169, 173 (Bankr.E.D.Tenn.2001) (internal quotation marks omitted); *see also TransSouth Fin. Corp. v. Sharon (In re Sharon)*, 234 B.R. 676, 687 (6th Cir. BAP 1999) ("A violation of the automatic stay can be willful when the creditor knew of the stay and violated the stay by an intentional act."). In fact, courts have held that:

> [a] specific intent to violate the stay is not required, or even an awareness by the creditor that [its] conduct violates the stay. It is sufficient that the creditor knows of the bankruptcy and engages in deliberate conduct that, it so

happens, is a violation of the stay. Moreover, where there is actual notice of the bankruptcy it must be presumed that the violation was deliberate or intentional. Satisfying these requirements itself creates strict liability. There is nothing more to prove except damages. *Bankers Healthcare Grp., Inc. v. Bilfield (In re Bilfield),* 494 B.R. 292, 301 (Bankr. N.D.Ohio 2013) (quoting *In re Daniels,* 206 B.R. 444, 445 (Bankr.E.D.Mich.1997)); *accord Printup,* 264 B.R. at 173; *In re Waldo,* 417 B.R. 854, 891 (Bankr.E.D.Tenn. 2009).

 There is no question that RFF knew of the Debtor's bankruptcy filing. The Debtor has provided ample evidence that he notified RFF and ADRS within three days of the Petition Date. Ex. 2. And RFF acknowledged the Debtor's bankruptcy when, among other times, it requested that the Arbitration Action proceed, Ex. 6, and fully participated in the Debtor's bankruptcy case.

RFF's conduct that violated the stay was also intentional. As noted above, it does not matter whether or not RFF believed it was violating the automatic stay when it continued the Arbitration Action against the Johnsons and TJI, requested findings against the Debtor's interest in the Arbitration Award and petitioned to have the Award confirmed in the State Court.[20] RFF had ample time to mend its mistake before it sought confirmation of the Award. Indeed, following the August 2015 Letter and the filing of the Enforcement Motion, RFF continued to prosecute its Petition to Confirm at the State Court hearing held on October 16, 2015. It is clear that RFF's pursuit of the Arbitration Award and the judgment confirming it in the State Court violated § 362(a)(3) of the Bankruptcy Code. And while counsel for

the Debtor did not cite § 362(a)(3) in the August 2015 Letter, it was incumbent upon RFF to govern itself in accordance with the dictates of § 362(a)(3) even if the Debtor had not pointed it to *Amedisys.* Neither the failure of the Debtor's counsel to cite § 362(a)(3) nor his inaccurate statement regarding the applicability of § 362(a)(1) did anything to absolve RFF of liability for violating the automatic stay.

The law is clear that an entity commits a willful violation of the automatic stay so long as it is aware of the stay at the time it takes an intentional act that violates the stay, even if it did not know that it was violating the stay and did not intend to do so. Here, RFF clearly was aware of the automatic stay at the time that it intentionally took acts that exercised control over property of the Debtor's bankruptcy estate, so every action taken by RFF to prosecute the Arbitration Action constitutes a willful violation of the automatic stay.

### E. Remedies for Violation of the Automatic Stay

#### 1. The Arbitration Award Is Void.

 In proceeding with the Arbitration Action without first seeking a determination that the stay did not apply or alternatively for relief from stay, RFF "[ran] the risk that the entire action later [would] be declared void *ab initio.*" *Chao,* 270 F.3d at 384. In the Sixth Circuit, "actions taken in violation of the stay are invalid and voidable and shall be voided absent limited equitable circumstances." *Easley v. Pettibone Mich. Corp.,* 990 F.2d 905, 911 (6th Cir.1993). According to the Sixth Circuit,

 only where the debtor unreasonably withholds notice of the stay and the

---

20. The Court is reserving a decision as to the extent of RFF's intent in including these findings until after a further evidentiary hearing to decide the issue of punitive damages.

creditor would be prejudiced if the debtor is able to raise the stay as a defense, or where the debtor is attempting to use the stay unfairly as a shield to avoid an unfavorable result, will the protections of section 362(a) be unavailable to the debtor.

*Id.* at 911. RFF has not argued—nor could it argue—that it would be prejudiced by the Debtor's assertion of the stay or that the Debtor is attempting to use the stay unfairly to avoid an unfavorable result. Moreover, the Debtor did not withhold notice of the stay, but instead brought the stay repeatedly to RFF's attention. *See id.* at 911–12. Thus, under *Easley,* the Court finds that the entire Arbitration Award and the judgment of the State Court confirming the Award is void and of no force or effect.

### 2. Monetary Sanctions Against RFF

Under the plain language of § 362(k), once a willful violation of the automatic stay is found, an award of actual damages is mandatory. 11 U.S.C. § 362(k) ("[A]n individual injured by any willful violation [of the automatic stay] *shall* recover actual damages ....") (emphasis added); *In re Bivens,* 324 B.R. 39, 42 (Bankr.N.D.Ohio 2004). An individual's actual damages resulting from a willful violation of the stay includes attorneys' fees and costs. 11 U.S.C. § 362(k); *see also Cousins v. CitiFinancial Mortg. Co. (In re Cousins),* 404 B.R. 281, 290 (Bankr.S.D.Ohio 2009) ("[B]ankruptcy courts in the Sixth Circuit have concluded that attorney fees are not in addition to actual damages but are a component of the actual damages recoverable under the language of § 362(k)(1).").

The Debtor's counsel submitted fee statements during and after the Hearing seeking payment for attorneys' fees and expenses. Exs. 32 & 37; Doc. 454. Because RFF has objected to the reasonableness of Debtor's attorneys' fees, Doc. 457,

and the Debtor has the burden of proving the requested fees are reasonable, *Cousins,* 404 B.R. at 290 n. 9, the Court will enter a separate scheduling order setting an evidentiary hearing on the reasonableness of the requested attorneys' fees (the "Damages Hearing"). The Damages Hearing also will address whether the Debtor is entitled to any punitive damages. *See Archer v. Macomb Cty. Bank,* 853 F.2d 497, 500 (6th Cir.1988) (holding that bankruptcy court has discretion to impose punitive damages if it believes the actual damages are "insufficient to deter ... deliberate and repeated violations of the automatic stay"); *In re Cepero,* 226 B.R. 595, 600 (Bankr.S.D.Ohio 1998) (awarding punitive damages "to punish [the creditor], and deter it from future violations of the automatic stay, and to properly encourage [the creditor] to institute procedures that will avoid future violations").

## VI. Conclusion

Although most practitioners, "when asked whether an act contemplated by a creditor might violate the automatic stay, are likely to advise their clients—out of an abundance of caution—that it is safer to ask permission than forgiveness," *In re Durango Ga. Paper Co.,* 297 B.R. 316, 321 (Bankr.S.D.Ga.2003), RFF's counsel did not do so here. As a result, RFF proceeded in a course of action that violated the automatic stay. For all the reasons set forth above, the Enforcement Motion is **GRANTED.** The Arbitration Award and the judgment of the State Court confirming it are void and of no force or effect.

**IT IS SO ORDERED.**